OC9NHIYH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          24 MJ 1971 (JW)

5   ERAN HIYA,

6                                          Conference
                   Defendant.
7   ------------------------------x

8
                                           New York, N.Y.
9                                          December 9, 2024
                                           11:00 a.m.
10

11  Before:

12                    HON. JENNIFER WILLIS,

13                                     U.S. Magistrate Judge

14                         APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    BY:  DANA R. McCANN
17       TARA LA MORTE
         Assistant United States Attorneys
18
    SHER TREMONTE
19       Attorneys for Defendant
    BY:  JUSTINE ALETA HARRIS
20       NOAM KORATI BIALE

21  ALSO PRESENT:

22  ROGER POLACK Department of Justice

23

24

25

1

2          THE DEPUTY CLERK:  Good morning.

3          Your Honor, we are here for *U.S. v. Hiya*.  We ask that

4     counsel for the government as well as counsel for defense

5     please rise and state your names for the record.

6          MS. McCANN:  AUSAs Dana McCann and Tara La Morte, for

7     the government.  With us at counsel table is Roger Polack from

8     the Department of Justice Office of International Affairs.

9          We are also joined by two paralegals from our office,

10    Christopher Harris and Lucy Gavin.

11         THE COURT:  Good morning.

12         MR. BIALE:  Good morning, your Honor.  Noam Biale and

13    Justine Harris, on behalf of Mr. Hiya, who is seated to our

14    left.

15         I also want to introduce some other members of our

16    team.  We have Wes Erdelack, who is seated in the back; Christa

17    Staropoli, they are both associates of my firm; Hilaria Hunter,

18    who is a paralegal in my firm.

19         I also want to introduce Mr. Nick Kaufman who is

20    Mr. Hiya's Israeli counsel.

21         THE COURT:  Good morning to you all as well, and to

22    you, Mr. Hiya.

23         I believe my deputy in error introduced this case as

24    *U.S. v. Hiya*.  It is actually *In the Matter of the Extradition

25    of Eran Hiya*, and that is what we are here to discuss today.

1    I will turn first to the government.  I think we all

2  sort of know that obviously of the five factors that we need to

3  consider that there's really only two that are in dispute, but

4  I believe the government has prepared a PowerPoint so I'll let

5  you get to it now.

6    MS. McCANN:  Thank you, your Honor.

7    So as your Honor knows, the United States, on behalf

8  of the government of Israel, seeks to extradite fugitive Eran

9  Hiya for his role in attempting to murder a rival gang member,

10  Eli Musli.

11    If your Honor permits I will walk through the abundant

12  evidence that the government of Israel has put forth, but I

13  will proceed in the following order:

14    First, by providing a brief overview of the

15  extradition process;

16    Second, by formally introducing the government's

17  exhibits; and

18    Third, as your Honor mentioned, by addressing the

19  merits of the request that are at dispute.  That's specifically

20  the jurisdiction and probable cause elements.

21    THE COURT:  If I can, Ms. McCann, I would like to just

22  make one change in how you plan to proceed.  I think the broad

23  overview and the introducing of the government's exhibits makes

24  sense at the outset.

25    Then when we get into the two of the five factors that

1  are in dispute I would like to pause when you are done with the

2  first disputed factor so that I can then hear from the defense

3  and then come back to probable cause rather than having you

4  make the entirety of your arguments.

5      I think that keeping it point to point will make it

6  easier to make sure that everybody has covered everything they

7  want to, and making sure I am putting things in the right sort

8  of box in my head.  Hopefully that will not throw off your

9  planned presentation too much.

10      MS. McCANN:  Sure.  Thank you, your Honor.

11      Specifically, the government of Israel has alleged

12  that Hiya coordinated the attempted murder with several other

13  gang members under his control, he directed gang members to

14  possess firearms and explosives and to conceal the identity of

15  stolen vehicles so that those vehicles could be used to escape

16  the scene of the crime he ordered the gang members to then

17  destroy those vehicles to conceal evidence of their use in the

18  assassination and supply at least one individual with a handgun

19  for the purpose of murdering the rival gang leader and its

20  members.

21      To start with the overview of the extradition process,

22  as you will have read in our briefs extradition, is *sui*

23  *generis*.  It is a unique process that is neither civil nor

24  criminal, so neither the Federal Rules of Criminal Procedure,

25  the Federal Rules of Evidence, or the Federal Rules of Civil

1    Procedure apply in extradition proceedings.

2            So it is a process that is governed twofold:  By the

3    federal extradition statute, under Title 18 of the United

4    States Code, Sections 3181 through 3196, as well as the

5    extradition treaty between the United States and the requesting

6    nation.  In this case that is the extradition treaty between

7    the United States and the government of Israel.

8            Section 3184 outlines a two part process that

9    allocates responsibility for extradition for two entities

10   within the U.S. government.  Those two entities are a judicial

11   officer of the federal court and the secretary of state.

12           Part one is the stage that we are in now.  That

13   requires a limited-scope hearing before a federal judge to

14   determine whether the requirements of the applicable treaty are

15   met.  The applicable treaty here is the one between the United

16   States and Israel.  So part one is not a criminal proceeding.

17   It is akin to a preliminary hearing to determine whether the

18   requirements of extradition are met.

19           If the Court finds that those requirements are met,

20   and I would walk through those requirements in a moment, the

21   Court will then certify to the secretary of the state that the

22   fugitive is extraditable.

23           Part two gives the final authority to the secretary of

24   state.  The secretary of state makes the ultimate determination

25   of whether to actually extradite the fugitive by returning the

1   fugitive to the requesting country.

2        The secretary of state has broad discretion, which

3   encompasses reviewing *de novo* the judge's findings.  So the

4   secretary of state may refuse extradition on a number of

5   discretionary grounds, including humanitarian and foreign

6   policy considerations.  The secretary of state may even grant

7   extradition with conditions at his discretion.

8        So, as I mentioned earlier, for the Court to certify

9   Hiya as extraditable there are five requirements.

10       The first requirement is whether the Court is

11  authorized to conduct an extradition proceeding.  Section 3184

12  authorizes any judge or justice of the United States to conduct

13  proceedings, and Rule 59.1(b) of SDNY Local Criminal Rules

14  authorizes magistrate judges to exercise jurisdiction set forth

15  in Section 3184.  So this court is clearly authorized to

16  conduct this extradition hearing, and there is no dispute about

17  that.

18       The second requirement is whether the Court has

19  jurisdiction over Hiya.  Now, under Section 3184, this Court

20  has jurisdiction over any person found within its jurisdiction.

21  This element is satisfied because when we filed the complaint

22  and provisional arrest request Hiya was in fact located in the

23  Southern District of New York, and that is sufficient for

24  jurisdiction.

25       Hiya disputes this element by attempting to divert

1    this court's' attention to a different treaty that is a treaty

2    between the U.S. and a third-party country as well as by

3    alleging due process violations.  Now we have outlined this in

4    our briefing and we will discuss this further shortly, but

5    these claims have no bearing on the question of this Court's

6    jurisdiction because the only applicable treaty here is the

7    treaty between the United States and Israel.

8         The third element is whether the extradition treaty

9    between the United States and Israel is in full force and

10   effect.  There is no dispute that this element has been

11   satisfied.  As we will see in a moment, there is a declaration

12   of C. Danae Ashkar from the State Department's Office of the

13   Legal Adviser which attests that the extradition treaty is in

14   full force and effect.

15        The fourth element is whether the extradition treaty

16   between the United States and the government of Israel covers

17   crimes for which extradition is requested.  This element is

18   commonly known as the dual criminality requirement.

19        Article 1 of the treaty provides for the extradition

20   of persons who have been charged with or convicted of any of

21   the offenses mentioned in Article 2 of the treaty.

22        The original text of Article 2 of the treaty, which

23   provided a list of extraditable offenses, was later modified by

24   the protocol of the treaty.  And that defines an offense as

25   extraditable if it is punishable under the laws of both parties

1    by a deprivation of liberty for a period of one year or by a

2    more severe penalty.  It also expressly includes attempt,

3    conspiracy, participation, aiding and abetting, and accessory.

4    So, again, this is known as the dual criminality requirement,

5    and the documents submitted by the government of Israel

6    establish that Hiya is facing six counts of violating Israel's

7    penal law.  Each of these crimes is punishable in Israel by

8    imprisonment for a period of one year or more and are duly

9    criminal in the United States.

10        The fifth and last element is whether there is

11   sufficient evidence to support a finding of probable cause as

12   to the crimes for which extradition is sought.  We will discuss

13   this in more detail in a moment, but Hiya disputes this element

14   by offering evidence that is not admissible or permissible in

15   the context of this limited-scope extradition hearing.

16        The government of Israel's extradition request is

17   supported by abundant evidence that would support a probable

18   cause finding.  So, as we discussed, as we mentioned at the

19   outset, we will focus on just elements two and five.  Element

20   two is the jurisdictional question, element five being the

21   probable cause question.

22        To the extent your Honor finds that these elements

23   have been met, the government would offer a proposed order,

24   which we have here today if the Court would like to see it, and

25   that proposed order reflects the five elements that we've

1   discussed.

2          So if your Honor does not have any questions at this

3   point, I will turn to the exhibits.  Then I will discuss the

4   elements in more detail.

5          The government intends to submit two exhibits today,

6   both reflecting documents that had been previously filed with

7   the Court.

8          Exhibit 1 is the declaration prepared by C. Danae

9   Ashkar, who is an attorney adviser for the Office of Legal

10  Adviser at the State Department.

11         This declaration serves three important functions.

12         The first function is that it states the view of the

13  executive branch of the U.S. government that the extradition

14  treaty between the U.S. and Israel is in full force and effect.

15  That's one of the elements that the government is required to

16  establish.

17         The second thing is that it states that the offenses

18  for which Israel has requested extradition are covered by the

19  treaty.  It also makes clear that the extradition request is

20  authenticated in accordance with the treaty and extradition

21  statute.

22         So as required by the treaty in Title 18, Section

23  3190, the documents submitted by government of Israel are

24  authenticated by the official seal of the ministry of justice

25  and were properly certified on June 23, 2024, by the director

1　of the department of international affairs of the ministry of

2　justice in Israel.

3　　　　So the declaration attaches two different documents.

4　　　　The first document is marked as Government Exhibit 1A,

5　and that is the diplomatic note from Israel requesting Hiya's

6　extradition.  It's dated June 25, 2024.  Again, it's marked as

7　Government Exhibit 1A.

8　　　　The declaration also attaches the extradition treaty

9　between the United States and Israel.  That includes the

10　convention and the protocol amending the convention.  Going

11　forward we will just refer to both of these documents simply as

12　the treaty.  That's marked as Government Exhibit 1B.

13　　　　As we might have mentioned, the declaration, the

14　diplomatic note, and extradition treaty were filed on the

15　docket already at ECF 13.

16　　　　Exhibit 2 is the government of Israel's request for

17　Hiya's extradition and the supporting documents that they

18　provided.  Those documents were also filed in July of 2024 at

19　ECF 13.

20　　　　So, your Honor, I have original versions of all of

21　these documents which have been marked for identification.  I

22　believe you may already have the Bates-stamped version.  If you

23　would permit, I would offer the original versions for the

24　Court's consideration.  Then I would move to enter those

25　exhibits in evidence.

1          THE COURT:  Any objection?

2          MR. BIALE:  Your Honor, no objection.

3          I just want to state for the record that the

4    government has represented that the exhibits that are being

5    introduced are identical to what was previously filed on the

6    docket at ECF 13.  We have not double checked, but I am

7    accepting that representation.

8          I probably at some point, or I may refer to parts of

9    the document based on the ECF Bates stamp number, just so we

10   all know what we are talking about, even though the government

11   exhibit that is now being moved for admission doesn't have that

12   Bates number.

13          With that clarification, no objection.

14          THE COURT:  Certainly.

15          Obviously we have all heard the government make the

16   representation that the documents in the original form are

17   identical perhaps with the exception of Bates stamp numbers to

18   what has already been filed on ECF 13.

19          MS. McCANN:  May I approach, your Honor?

20          THE COURT:  You may.  And those documents will be

21   admitted.

22          (Government Exhibits 1 and 2 received in evidence)

23          MS. McCANN:  As your Honor mentioned, we will start

24   with the jurisdictional question.

25          There are kind of two arguments that are being made,

1    so if your Honor permits I will walk through just those two

2    arguments under jurisdiction and then hold on the probable

3    cause argument.

4                THE COURT:  Yes.

5                MS. McCANN:  So, your Honor, the government believes

6    that jurisdiction is met in this case simply because the

7    inquiry is very plain.  The basis for jurisdiction in this

8    proceeding falls squarely under Section 3184, which vests this

9    court with jurisdiction over any person found within the

10   jurisdiction of this court.

11               Hiyas was in New York when the government filed its

12   complaint and arrest request, and Hiya was arrested in the

13   Southern District of New York.  Hiya has raised arguments that

14   are not germane to the question of whether this Court has

15   jurisdiction over Hiya.

16               Based on the briefing, again, there are two arguments

17   that we expect Hiya will rely on to dispute jurisdiction.  The

18   first argument that Hiya raised is an alleged violation of the

19   extradition treaty between the United States and Malaysia

20   simply because Hiya was physically present in Malaysia several

21   days before he was found in New York.

22               This argument has to do with what is known as the rule

23   of specialty, which is enumerated in the extradition treaty

24   between the United States and Malaysia.  The rule of specialty

25   is derived from principles of international comity, and it

requires a country seeking extradition to adhere to limations

based on the prosecution by the surrendering country.  So the

extradition treaty between the United States and Malaysia

simply incorporates the rule of specialty by spelling out

exactly what limitations would be placed on the country seeking

extradition from the other country.

The U.S.-Malaysia extradition treaty spells out two

limitations in Article 16(1) and Article 16(2).  The first

limitation under Article 16(1) is that a person extradited

under the treaty may not be detained, tried or punished in the

requesting country except for offenses for which extradition

has been granted and a few other specified circumstances.

The second limitation under Article 16(2) is that a

person extradited under the treaty shall not be extradited to a

third state for an offense committed prior to the person's

surrender unless the surrendering state consents.

To put Article 16(2) more plainly, if Hiya was

extradited from Malaysia to the U.S., the treaty places

limitations on the circumstance that is would allow the U.S. to

then send Hiya to another third-party country.  In this case

that would be Israel.  These are the limitations that the U.S.

and Malaysia have placed on each other when a person is

extradited from one country to the other.  So the key word

here, your Honor, is "extradited."

So Hiya argues that by seeking extradition to Israel

1    that that's a violation of the second limitation outlined in

2    Article 16 of that treaty, but as Hiya concedes in briefing,

3    Hiya was not extradited from Malaysia to the U.S.  So the

4    Malaysian extradition treaty does not apply here, and we

5    believe that the Court should disregard it.

6            THE COURT:  Is their argument really focused on the

7    treaty though?

8            I mean when we talk about whether or not the United

9    States properly has jurisdiction over someone, certainly there

10   are cases cited by defendant, respondent, whatever the term

11   would be in this kind of proceeding, that sort of speaks to a

12   broader concern about due process, fairness.

13           It seems to me that there's two issues when we are

14   thinking about whether the U.S. properly has jurisdiction.  One

15   certainly, as you said, is this question of are we following

16   requirements or whatever agreements we have with our foreign

17   partners.  But looking at *Atta I*, for example, it seems to

18   speak to this larger problem that if the U.S. is -- I will call

19   it illegally or some kind of non-due-process-based way getting

20   ahold of someone, that that kind of speaks to a broader

21   interest of the country and the judiciary making sure that kind

22   of thing doesn't happen.

23           I hear you as saying that Mr. Hiya was not in fact

24   extradited from Malaysia, and therefore whatever is or is not

25   in the agreement with Malaysia isn't really the issue.

1    But what about this broader issue that I see *Atta I* as

2    raising, that the way in which someone arrives in the United

3    States matters or should matter to the U.S. judiciary?

4    What is your response to that.

5    MS. McCANN:  Yes, your Honor.  We would agree with

6    that characterization.  We believe that the argument they are

7    making in response to jurisdiction is twofold.  There is an

8    argument that Hiya was extradited from Malaysia to the U.S. and

9    therefore the treaty between the U.S. and Malaysia has been

10   violated.

11   That scenario requires extradition.  So we believe

12   there is a second argument to your point, your Honor, that they

13   are making that is inapposite to the first argument, that

14   because Hiya was not extradited and was, in their words,

15   forcibly taken from Malaysia, that that violates due process.

16   I am happy to address that argument for your Honor now.

17   THE COURT:  I don't want to skip ahead if you had more

18   to say on the applicability of the treaty with Malaysia.

19   Maybe the question to ask there goes to the

20   respondent, to Mr. Hiya's argument that Malaysia detaining him

21   and getting him and sending him to the United States, the U.S.

22   asking for all of that was sort of -- they don't use the word

23   ruse, but that that is what is going on.

24   So this question of whether he was technically

25   extradited, whether he was deported, whatever happened in

1    Malaysia, if the United States initiated that, if they asked

2    Malaysia to arrest him, to get him, to hold him, to give him to

3    the United States, I know that that in part is going to go to

4    our second question, right, but on the first issue of our

5    agreements with Malaysia, if that was done in a way that, I'll

6    call it under false pretenses, where the United States didn't

7    reveal to Malaysia its ultimate intent to send Mr. Hiya to

8    Israel, is there a world where even if his extraction was not

9    technically an extradition that it still does implicate our

10   sort of diplomatic agreements with Malaysia?

11          MS. McCANN:  Your Honor, I believe that there is no

12   obligation for us to, for the United States to inform Malaysia

13   of the extradition request from Israel.  I can't make

14   representations as to whether the United States agents did in

15   fact inform Malaysia, but I believe our position would be that

16   we are under no obligation to disclose the potentially

17   impending extradition request from Israel.

18          The extradition treaty between the U.S. and Malaysia

19   was just not invoked, and there are other processes by which to

20   obtain an individual from another country such as deportations,

21   expulsions, as is the case here, that can be used to obtain

22   custody over an individual and bring them back to the U.S.  We

23   are not required to invoke a treaty just because the treaty

24   exists.

25          THE COURT:  Are there, I'll call it due process

1    requirements for a, I'll term it request to deport?

2          Obviously, we know that when we are trying to

3    extradite from one country or we're extraditing to another

4    country that there's clearly a lot of process involved, but a

5    request for deportation, does that have a list of due process

6    requirements, or does the United States really have to say this

7    is our citizen we would like you to deport them to us?

8          MS. McCANN:  We take the position that there are no

9    due process considerations just because an individual was taken

10   from another country outside of the extradition process.

11         I think the crux of this argument falls within what is

12   known as the *Ker-Frisbie* doctrine.  That doctrine comes from

13   two Supreme Court cases that basically say that the power of a

14   Court to try a person for a crime is not impaired by the fact

15   that the person has been brought into the Court's jurisdiction

16   by reason of, and the quote I'll use is forcible abduction,

17   which is the phrase they used in those cases and the phrase

18   that Hiya has adopted.

19         I want to be clear before I go into this due process

20   argument that we believe that a due process violation, even a

21   potentially alleged forcible abduction, again to use Hiya's

22   words, is not a defense in an extradition proceeding.  An

23   extradition proceeding, as I mentioned earlier, is very limited

24   in scope and it differs from a criminal proceeding and a

25   criminal prosecution.

OC9NHIYH

1    So the line of cases, particularly *Ker-Frisbie*, and

2 I'll talk about *Toscanino*, which was an exception to that,

3 these involved criminal prosecutions.  To your Honor's point,

4 there is one case, which is the *Atta* case, where this analysis

5 was applied in an extradition proceeding.  We believe that even

6 if you were to apply this due process consideration in an

7 extradition proceeding, it still does not meet the standard

8 required or the level of allegations required to absolve this

9 Court's jurisdiction over an extradition proceeding.

10    THE COURT:  Let me ask you a question.  I should have

11 asked this at outset.  Obviously the burden is on the

12 government to demonstrate that Mr. Hiya is in fact

13 extraditable.  When it comes to the second of the five factors

14 that are being contested, it is clear what the standard is

15 because it's right there in the title.  It's probable cause.

16    What is the standard with respect to factor two, this

17 question of whether or not the U.S. has jurisdiction over him?

18    How convinced do I have to be I guess is the question?

19    MS. McCANN:  Just so I am understanding your Honor's

20 question, I guess your question is what is the standard for

21 finding -- jurisdiction is the substantive standard.

22    THE COURT:  Yes.

23    MS. McCANN:  But what is your standard for finding

24 jurisdiction?

25    THE COURT:  Yes.

OC9NHIYH

1      MS. McCANN:  I don't believe -- one moment, your

2   Honor.

3      Your Honor, we believe the standard for all five

4   elements would be probable cause, so akin to like the

5   preliminary hearing context.

6      THE COURT:  On this I am, because when we were

7   prepping, I was like I don't know what it is.  What is your

8   source for that belief?

9      MS. McCANN:  One moment, your Honor.

10      Your Honor, I believe we've seen the probable cause

11   standard for all elements in the case law, and we would be

12   happy to brief that for your Honor later today or whenever your

13   Honor permits.

14      THE COURT:  Briefing sounds a bit strong.  I don't

15   know that it's going to turn on that.

16      MS. LA MORTE:  Maybe not a brief, your Honor, but just

17   some case cites.

18      THE COURT:  To the extent there is a, case I want to

19   make sure for my own purposes I put everything in the right

20   place.  I don't need pages on this issue, just a case that is

21   going to give me the answer.  I'm happy to receive that

22   afterwards.

23      You can continue.  Thank you.

24      MS. McCANN:  Your Honor, on the due process question,

25   again, we just want to be clear that we don't think due process

1    is applicable in this type of proceeding.  That's primarily

2    because it is not a criminal proceeding, so the Fifth Amendment

3    deprivation of the defendant's like civil or criminal rights is

4    not at issue here.  This Court is simply tasked with the

5    question of whether or not to issue a certificate of

6    extraditability.  So there is no deprivation of a defendant's

7    liberty.

8         If due process was an appropriate consideration for

9    this context, the Second Circuit has made clear that a forcible

10   abduction -- right, again his characterization and the phrasing

11   used in case law -- does not absolve a Court's jurisdiction.

12        There's one case where the Second Circuit made an

13   exception to that and that conduct that was alleged by the

14   defendant, in that case the defendant alleged torture and

15   inhumane treatment.  Hiya was deported from Malaysia and not

16   forcibly abducted.  His allegations do not rise to the level of

17   the conduct that was raised by the defendant in that one

18   exception.

19        And so, again, this argument we believe falls under

20   the *Ker-Frisbie* doctrine.  So that Second Circuit case where

21   the court strayed away from this general understanding that

22   forcible abductions do not absolve a court's jurisdiction, that

23   case is called *United States v. Toscanino*, and the case

24   citation is 500 F.2d 267.

25        In that case, again, your Honor, the allegations

1     amounted to "shocking governmental conduct."  That conduct

2     included extreme violence, torture, forced interrogations.

3     Because of those allegations, the Second Circuit remanded that

4     case for a hearing and required the government to respond to

5     the defendant's claims of torture and inhumane treatment.

6          Generally, the Second Circuit has said and the Supreme

7     Court has said that a forcible abduction alone is not shocking

8     governmental conduct that violates due process.

9          Just a year later the Second Circuit then, keeping

10    *Toscanino* in mind, because they had in this one case, in

11    *Toscanino*, made an exception to the *Ker-Frisbie* doctrine, just

12    a later in *U.S. ex Rel. Lujan v. Gengler* the Second Circuit

13    made a clear -- they made it clear that the *Toscanino* exception

14    was just a limited exception for cases that involved conduct

15    that arose to that level.

16         So *Toscanino* is restricted to very unique and extreme

17    facts.  The Second Circuit has reaffirmed *Ker-Frisbie* in *Lujan*,

18    and they also reaffirmed *Ker-Frisbie* in subsequent cases.  So

19    nothing Hiya alleges here raises to this level of conduct that

20    was alleged in *Toscanino*.

21         There's one case that we think outlines this notion

22    that this type of consideration does not apply in extradition

23    proceedings.  That case is *In Re David*.  The cite is 390

24    F.Supp. 521.  That's an Eastern District of Illinois case.  And

25    that case in particular is a case involving an extradition

1  proceeding, because again these cases, *Ker-Frisbie*, *Toscanino*,

2  *Lujan*, they are procedurally inapposite to the case here.

3        This is an extradition proceeding, so like *In Re David*

4  in that case, the fugitive alleged that he had been kidnapped

5  in Brazil by agents of the U.S. and returned to New York.  The

6  U.S. sought his extradition.  So before the court was the same

7  type of extradition proceeding that we have in front of us

8  today, and the government's response in that case was the same:

9  Even if a kidnapping did occur, it didn't deprive the district

10  court of jurisdiction over the fugitive's extradition

11  proceeding.

12        So the Court agreed, applied the distinction between

13  *Toscanino*, in which the Court made that *Ker-Frisbie* exception,

14  and they analyzed that against *Lujan*, which is where the Second

15  Circuit went back and said, in *Toscanino* we didn't mean to make

16  a new rule, that that was just an exception for conduct that

17  arose to that extreme level.

18        So the facts of the fugitive's case in that case were

19  more akin to *Lujan*, and the Court made that point.  But then

20  they also made the point that criminal cases where

21  jurisdictional decisions were are predicated on Fifth Amendment

22  and due process considerations are not applicable here.

23        THE COURT:  Can I pause you for a moment.

24        MS. McCANN:  Sure.

25        THE COURT:  In *David* was the allegation in terms of

1    sort of the international underpinnings -- I'm skimming the

2    case.  Obviously the allegation was that he had allegedly been

3    kidnapped from Brazil.  But was there then sort of an

4    anticipated extradition to a third country, or was it merely

5    the allegation that the U.S. allegedly kidnapped him from the

6    Brazil with the idea of proceeding with some type of criminal

7    proceeding here in the United States?

8         MS. McCANN:  I believe in that case -- and I can

9    follow up with that, your Honor -- but I believe in that case

10   there was a request that the defendant or the fugitive in that

11   case be extradited from Brazil to the third-party country, but

12   instead they were able to bring the fugitive in this case to

13   the U.S. and then proceeded with extradition proceedings.

14        THE COURT:  Okay.

15        MS. McCANN:  So that case didn't end at the district

16   court.  The Seventh Circuit upheld that notion, that due

17   process is an issue that is inapplicable in circumstances of an

18   extradition proceeding.

19        We believe that this proceeding, like *David*, is

20   narrow.  And because this Court is not depriving Hiya of any

21   liberty, the sole issue is whether Hiya should return to Israel

22   and stand trial.

23        As I mentioned, your Honor, we did want to address the

24   *Atta* case as our final point we believe on jurisdiction.

25        Atta reflects the single example of an instance when

1   due process was considered and then the Court applied the

2   *Ker-Frisbie* doctrine in an extradition proceeding context.  But

3   that decision was later determined to be wrong as a matter of

4   law and fact.

5           In the first proceeding, which we referred to in

6   briefing and will refer to now as *Atta I*, the magistrate judge

7   didn't certify extradition on jurisdictional grounds because

8   the fugitive had been brought illegally into the United States.

9           The judge in that case was aware that due process is

10   an argument that is more appropriately made in criminal

11   prosecutions.  The judge distinguished the *Ker-Frisbie* line of

12   cases because an extradition proceeding is designed to send the

13   individual back to a requesting country, and the court said in

14   *Atta I* that they could not assure that the accused fugitive

15   would receive due process once he was returned to that third

16   country.

17           But in *Atta II*, once the U.S. refiled their

18   extradition request, the district judge found that the previous

19   decision that was made was improper as a matter of law and

20   fact.  "On the facts there is no basis for concluding that the

21   request for a fugitive's return to the U.S. would shock the

22   conscience or run counter to the decencies of civilized

23   conduct," and those are quotes used by the Court.  On the facts

24   the Court believed that there was just no basis for the first

25   judge to hold that the fugitive's due process rights were

OC9NHIYH

 1   violated.

 2        But as a matter of law the court, the district court

 3   said that at best the most that could have been drawn from the

 4   initial judge's reasoning was that even if the manner in which

 5   the person's presence or custody is obtained, even if that

 6   violates due process, the remedy for that violation -- on due

 7   process, the remedy for that violation would depend on the

 8   process that that person is afforded in subsequent proceedings.

 9   So that's proceedings after the extradition hearing takes

10   place.  And this district judge interpreted that to mean that

11   we would, as a remedy, need to assure that due process was

12   afforded to the fugitive in that third-party in the requesting

13   country.

14        So, your Honor, in closing, we would just like to

15   emphasize that the government is equally invested in assuring

16   that Hiya is afforded due process.  We just believe that this

17   is not the correct forum for that argument.

18        To the extent your Honor believes that due process

19   considerations should be applied, it still doesn't arise to the

20   level of what has been alleged in the exception to the

21   *Ker-Frisbie* doctrine.

22        THE COURT:  So your position is that the only

23   exception would be -- you are saying shocks the conscience, but

24   the only example we have here is if there is torture that is

25   alleged.

OC9NHIYH

1          Is that your position?

2          MS. McCANN:  That is right, your Honor.  That's right.

3          Your Honor, just to put some color on that, I think

4    this may have been mentioned in our briefing, but the

5    allegations in *Toscanino* were very extreme.  That is the one

6    case where the Second Circuit still didn't fail to extradite

7    the fugitive, or didn't absolve the Court's jurisdiction, but

8    in this case they found that because the allegations were so

9    extreme they remanded it for a hearing to at least have the

10   government respond to the allegations that the defendant was

11   making.

12         The defendant alleged very egregious conduct:  Torture

13   and interrogation that lasted for 17 days.  There were

14   electrodes attached to the defendant's genitals, his toes, his

15   earlobes.  He was shocked into unconsciousness.  The defendant

16   in that case was forced to respond to interrogation by having

17   alcohol flushed into his eyes and other openings in his body.

18   His fingers were pinched with plyers, and he couldn't walk for

19   seven or eight hours.  He was subject to sleep deprivation,

20   force fed only enough to keep him alive.  I mean the

21   allegations in that case were extreme.  What is being alleged

22   here is nowhere near the conduct that was being alleged in

23   *Toscanino*.

24         THE COURT:  Before I turn to Hiya, let me ask you, you

25   argued that in *Atta II*, as you're referring to it, that the

1    finding of the district court judge was that as a matter of law

2    *Atta I* had been incorrect.

3              I did sort of skim everything obviously, but there is

4    a lot of material here.  My recollection is that there was a

5    change in the facts that were offered up in *Atta II*, and that

6    based on those new facts the district court judge was able to

7    conclude that the issue had sort of been resolved, that it was

8    not so much, you know how we sometimes see there is an appeal

9    to a DJ, and the DJ says this decision was incorrect, but

10   instead the DJ was presented with additional facts when the

11   government sought extradition again.  So it wasn't so much that

12   the DJ was finding that as a matter of law the magistrate judge

13   had been incorrect in the first instance.

14             Is that your reading of those cases?

15             MS. McCANN:  Sorry.  One moment, your Honor.

16             Your Honor, I believe that that may be correct, but I

17   think the crux of the argument that we're making with regard to

18   *Atta* is that even though additional facts may have been

19   provided to the Court, the overarching decision was that even

20   if you apply the *Ker-Frisbie* doctrine, the fugitive's

21   allegations did not arise to the level that's required for

22   dissolution of the Court's jurisdiction.

23             In order for this Court to not have jurisdiction over

24   the extradition hearing or for there even to be a question that

25   the Court has no jurisdiction over this hearing, there would

OC9NHIYH

1    have to be very extreme conduct alleged.  Even then I don't

2    know that it would absolve this Court's jurisdiction.  I think

3    it would just be a matter of, a question of gathering more

4    information on that issue.

5         But, your Honor, taking the *Ker-Frisbie* doctrine on

6    its face, what Hiya has alleged simply does not rise to that

7    level.  So we think that *Atta* really supports our argument

8    because --

9         THE COURT:  I want to make sure I understand.

10        MS. McCANN:  Sure.

11        THE COURT:  It doesn't arise to that level because in

12   fact there was a legal process, *i.e.*, deportation; or it

13   doesn't arise to that level, even if he were in fact, I don't

14   know, black ops, rendition, whatever it is, from Malaysia?

15        MS. McCANN:  It doesn't arise to that level because

16   Hiya doesn't allege any conduct that arises to that level.  The

17   *Ker-Frisbie* doctrine says that just because someone is forcibly

18   abducted that doesn't divest a Court's jurisdiction.  You have

19   to allege specific conduct that rises to the level of

20   *Toscanino*.

21        Our understanding of Hiya's allegations is that he was

22   not given an explanation about the crimes for which he was

23   charged.  Malaysian police held him for a certain amount of

24   time, may not have allowed him to speak to an attorney.

25        We can't attest to these allegations, but nothing that

1    Hiya alleges, even taking them on their face, taking them as

2    accurate, they don't rise to the level of *Toscanino*.

3           So while we think applying this argument in this

4    proceeding, in a limited-scope extradition hearing is

5    inappropriate, we do think that even if your Honor were to

6    apply that doctrine, Hiya's allegations don't meet that

7    standard.

8           If you have no further questions, I will hold the

9    probable cause argument and I will take my seat.

10          THE COURT:  Yes.  Thank you.

11          MS. McCANN:  All right.

12          MR. BIALE:  Good afternoon in one minute, your Honor.

13          So I want to start with where government counsel

14   started and where your Honor actually started, which was the

15   caption of this case.

16          This is not a criminal case.  This is not the United

17   States of America v. Eran Hiya.  It is an extradition

18   proceeding for extradition out of the country to a third party

19   country.

20          Why is that important?

21          Because all of the cases that the government has

22   marshaled and discussed in its comments to you this morning,

23   the *Ker-Frisbie* doctrine, *United States v. Alvarez-Machain* --

24   which is a Supreme Court case, I am just going to call it

25   *Alvarez* -- and *Toscanino*, those are all criminal cases in

OC9NHIYH

United States courts brought for crimes committed in the United
States.

THE COURT:  Well, with the exception of *In Re David*,
which was the one I was --

MR. BIALE:  I will get to that in a moment.

I want to make it clear, though, that the *Ker-Frisbie*
doctrine and the exception that the Second Circuit recognized
to it in *Toscanino* really has no bearing on this proceeding.

Those are all cases where the Court's jurisdiction
arises under its original jurisdiction under 18 U.S.C. Section
3231.  This case arises instead under the Court's jurisdiction
from the extradition statute as Ms. McCann mentioned.

That is a completely different line of doctrine.  And
the case that I brought to the Court's attention this morning,
which is *Lo Duca v. United States*, makes it clear that in fact
the Court's jurisdiction over this matter doesn't even arise
from Article III.

In this case, when the Court is sitting as essentially
an extradition officer, the Court is effectively a commissioner
of the executive branch.  That's what the Second Circuit said
in *Lo Duca*.  That does not mean that due process and the
constitution don't apply.

The government said in its opening remarks there are
no due process considerations here.  Due process is not
applicable because this is not a criminal proceeding, but as

1   the Court knows, due process is implicated in civil

2   proceedings, due process is implicated in proceedings that are

3   held before the executive branch.  The sort of fundamental

4   procedural due process case, *Matthews v. Eldridge*, is about an

5   executive branch adjudication and limits on personal

6   jurisdiction, which is what we're arguing here.  We are not

7   saying that the Court lacks subject matter jurisdiction.  The

8   Court has subject matter jurisdiction under the statute.

9          What we are arguing is that the way in which Mr. Hiya

10  was brought undermines and divests the Court of personal

11  jurisdiction.  It is well established, since cases as old as

12  *International Shoe*, that due process is implicated in personal

13  jurisdiction questions.

14         Okay.  So I just want to lay that all out.  That's

15  pretty high-level legal theory, but it is important because

16  that sets the stage for what we are talking about.

17             THE COURT:  Is the --

18             MR. BIALE:  I'm okay.

19             THE COURT:  I had a situation where a Court

20  interpreter went down quite hard tripping over a cord, so we

21  don't want a repeat of that --

22             MR. BIALE:  I appreciate it.

23             THE COURT:  -- and turn it into a whole scene.

24             Is the personal jurisdiction due process question the

25  same -- when we think about personal jurisdiction of the Court,

1   often that comes up in any type of case, civil cases, but here

2   if what is governing our actions here is the federal

3   extradition statute -- I guess what I am saying is are they

4   identical?

5          The personal jurisdiction requirements under the

6   extradition statute, can we just borrow those wholesale from

7   the broader jurisprudence with respect to personal jurisdiction

8   in the court?

9          MR. BIALE:  I don't think you need to do that, your

10  Honor, and I don't think there are cases saying that.  I raise

11  those issues because it's clear that due process is implicated

12  in this proceeding.  The notion that there are simply no due

13  process rights for an American citizen brought here by the

14  United States government under false pretenses -- and I will

15  get to that -- for the purpose of extradition to a third

16  country in a situation where we know from the treaty that

17  Malaysia would not have consented had it known that that was

18  the government's purpose, I think the notion that there are

19  simply no due process implications, that Mr. Hiya has no

20  constitutional rights with regard to this proceeding, that

21  can't be the law.

22         I raise the issue about personal jurisdiction just to

23  make the point that in that context, due process clearly

24  applies, and the question for the Court is how it applies here.

25         Now, there are limited cases explaining how due

1  process applies in an extradition-out proceeding.  I think your

2  Honor has zeroed in on basically the one case where this issue

3  is really discussed at length, which is the *Atta* case.

4      I will talk about why *Atta I* is good law and why the

5  Court should follow it, and why *Atta II* does not bind the

6  Court, the language about how *Atta I* was decided wrongly on its

7  facts is dicta, and how *Atta II* makes some of the same legal

8  errors that the government is making in its argument.  I am

9  going to talk about that later.

10     But *In Re David* is a similar issue, where it's just

11 factually distinct from this case.  In that case, an individual

12 was properly brought here.  I think -- I will double check --

13 he alleged that he was not.  But he was tried here for crimes

14 in New York.

15     Subsequent to that, France initiated an extradition

16 proceeding against him.  There was no evidence that the United

17 States had colluded with France to obtain Mr. David from

18 Brazil, that it concealed from Brazil the true purpose of

19 bringing him here or anything like that.  None of those facts

20 are present in the *David* case.

21     The only case that is really on all fours with this

22 case in terms of the facts is *Atta I*.  I want to get to that,

23 but if I may, your Honor, I just want to talk a little bit

24 first about what some of the key facts are and what I think is

25 not in dispute in this case and what is in dispute.

1        First of all, before I do that, let me just move

2    admission, as the government did, of the exhibits that were

3    attached to our briefing, and in addition, the affidavit that

4    we submitted to your Honor from Malaysian counsel.  We

5    submitted it by e-mail and on the docket.  I handed a copy of

6    it up to your Honor before.

7        These are the documents that we are relying on.  I

8    don't think there is any question as to their authenticity, so

9    we would move their admission.

10        MS. McCANN:  Your Honor, we would object to the

11    admission of the affidavit that was submitted just a few days

12    ago.

13        As to the exhibits that were attended to Hiya's brief,

14    those are already part of the case record, so there is no

15    objection there.  But the government's position is that there

16    is no evidence that Hiya's offering that is admissible in this

17    type of proceeding.  So we would object to the admission of

18    additional document in evidence in this case.

19        MR. BIALE:  I heard the government say before that the

20    rules of evidence don't apply.  So I guess your Honor can do

21    whatever you want in terms of admissibility.

22        But I don't quite understand the distinction of the

23    exhibits to our briefing being part of the record of this case.

24    We want them to be part of the evidentiary record of this

25    hearing.  They are documents that either came from the

1    government or there is an affidavit from Mr. Hiya that is

2    properly authenticated.  The affidavit from Malaysian counsel,

3    which we submitted, and it's docket 28, that is also

4    authenticated as required under the laws of Malaysia.

5        In addition to that, the affidavit follows the

6    convention of admitting declarations made outside the

7    jurisdiction of the United States, which is simply to affirm

8    that under penalties of perjury under the laws --

9        THE COURT:  I don't think the government's objection

10   is based on the idea that the document somehow isn't

11   authenticated or didn't follow the usual requirements of the

12   Federal Rules of Criminal Procedure or the Federal Rule of

13   Civil Procedure.

14       I heard Ms. McCann's objection as being a broader one,

15   that in an extradition defense, respondent, Hiya, the person

16   whose extradition is being sought, extraditee perhaps, is not

17   allowed to present evidence in the usual course that you would

18   if there was a trial.

19       Look, regardless of all that, I am going to admit it

20   for this purpose.  I think that it should be part of the record

21   to the extent that if this is reviewed later on appeal, the

22   idea that there's something out there I think it should be

23   preserved.  Whether or not it will be something that I in fact

24   rely on when we sort of get to arguments about are you

25   putting -- I think it really goes more to the probable cause

1    piece of the case, but the question of can defense put forward

2    evidence, is that allowed, what is the limited scope, I will

3    obviously take all of that into consideration.  But at the very

4    least I see no harm in admitting it so that it is part of the

5    record.

6           As Hiya's counsel has pointed out, there are other

7    affidavits and declarations and the like that had been included

8    and the government has no objection to as part of their motion

9    papers.  Presumably if this document had been available sooner,

10   it would have been included in that number.

11          So I will admit all of defendant extraditee --

12          MR. BIALE:  You can say defendant.

13          THE COURT:  Extraditee's documents.

14          MR. BIALE:  Okay.  Thank you, your Honor.

15          Of course, I am going to refer to the documents now

16   just as they go to the jurisdictional question before the

17   Court, not to the probable cause consideration.  I will say

18   with respect to the standard -- and candidly this is not an

19   issue that we've done a lot of research on -- but think the

20   standard for finding jurisdiction in most circumstances is a

21   preponderance of the evidence, not probable cause.  But to the

22   extent that's a concern for the Court, I would welcome the

23   government's invitation to brief it very short fashion later.

24          So turning to some of the facts, let me just highlight

25   a couple of pieces of the chronology because I think they're

1    important here.

2          So, as we know from the documents that we've

3    submitted, talks between Israel and the United States about

4    locating Mr. Hiya go back to at least July 2020.  We know that

5    a red notice was issued by Interpol for Mr. Hiya's arrest on

6    April 5, 2024.

7          That red notice, as all red notices, had to be based

8    on a valid arrest warrant issued by a country, and in this case

9    it was issued based on an arrest warrant from Judge Avital

10   Gilboa in the Tel Aviv magistrate's Court.  That was issued on

11   or about April 4.  That is an arrest warrant for the crimes

12   that are at issue in this extradition proceeding.

13         There is no case against Mr. Hiya in the United States

14   at that point.  There is solely coordination between the United

15   States and Israel to try to locate Mr. Hiya to send him to

16   Israel to face those charges in Israel.

17         Now, after that red notice is issued, the United

18   States knows at that point, because its partners in Israel told

19   it so, that Mr. Hiya was in Malaysia.  The United States

20   government then kicks into high gear, scrambles to get an

21   arrest warrant for Mr. Hiya here on what I am going to call the

22   sham passport fraud case, and I will explain why later.

23         It then tells Malaysia, we want Mr. Hiya brought to

24   the United States to face this passport fraud case.  It sends

25   Malaysia documents from which it has scrubbed any mention of

1    the Israeli arrest warrant, any mention of the fact that

2    Mr. Hiya is an Israeli citizen, and any mention of Israel other

3    than one document that just says he is a rival of some Israeli

4    gang.

5         But they take out the fact that he has an Israeli

6    passport.  They take out the fact that he is an Israeli

7    citizen.  That is all in documents that are going back and

8    forth between Israel and the United States but are scrubbed

9    from the materials sent to Malaysia.

10        The United States gets an indictment for Mr. Hiya on

11   May 6, 2024, on the passport fraud case.

12        Then on May 10, 2024, Israel issues a second arrest

13   warrant.  It is unclear with why Israel would need to issue a

14   second arrest warrant just a month after it had issued an

15   arrest warrant for Mr. Hiya on the same charges that were the

16   basis of red notice.

17        But that second arrest warrant, your Honor, is the one

18   that Israel cites in its request for extradition, that the

19   government cites in its papers to your Honor.  The reason I

20   submit is because the United States and Israel want this Court

21   to believe that the charges in Israel postdate the charges in

22   the United States.

23        That is not true.

24        The charges in Israel came first.  Then they got a

25   second arrest warrant to make it appear that the charges in

OC9NHIYH

1    Israel only arose after the indictment was obtained here in the

2    United States.

3          THE COURT:  This question may be coming a bit

4    prematurely, because you have already sort of teed up the idea

5    that you are going to talk about the sham passport case, but

6    let me sort of throw this out there, and then you can either

7    respond now or when you think it would be most useful.

8          I guess I have a broad question about whether or not

9    pretext matters, right?  Just for local stuff in America, it is

10   fine for the police to follow somebody that they have been

11   targeting for some big offense and wait until they invariably

12   commit a traffic offense and then pull them over even though

13   that's not really why they were following them.

14         So I certainly hear your argument that the United

15   States is holding back information in terms of their

16   communications with Malaysia, but as long as the communications

17   that they do make are truthful, what I mean by that is, Hiya is

18   also a citizen of the United States.  Perhaps they are not

19   obligated to say he is a citizen of Israel.  And also is there

20   a third?  Turkey?

21         MR. BIALE:  Poland.

22         THE COURT:  Poland.  As long as they are truthful that

23   he is a citizen of the United States such that he could be

24   deported here, as long as they are truthful that there is a

25   crime that he could be charged for in the United States and

1  ultimately is charged with, the United States gets a warrant

2  for him, he's indicted by a grand jury sitting in this

3  district, so whether they truly want him on an offense, which I

4  have never seen anyone gotten from another country on an

5  offense of that type with the sort of guideline range that it

6  carries, but to the extent that there is at least probable

7  cause at this point that he committed a United States crime

8  that has jurisdiction in the Southern District of New York,

9  does it matter that there may be a deeper motive, as long as

10 that information that was presumably transmitted to Malaysia is

11 truthful?  Does it really matter that the U.S. has a deeper

12 agenda and doesn't care about this passport fraud and just

13 plans to send him to Israel?

14         MR. BIALE:  If I may have a moment.

15         THE COURT:  Yes.

16         MR. BIALE:  Your Honor, I think it matters for a

17 couple of reasons.

18         First, to be sure, pretext is allowed in certain

19 contexts in American law.  But at the same time, material

20 omissions are treated the same as material misrepresentations.

21         Why are the omissions of Mr. Hiya's Israeli

22 citizenship and the Israeli case material in this situation?

23         Well, I think the treaty between the United States and

24 Malaysia shows you why that's material.  That is information

25 that Malaysia would want to know in deciding how to deal with

1    an individual within its jurisdiction, because Malaysia does

2    not want to transfer an individual to a country with which it

3    has an extradition treaty just so that person can be

4    transferred to a third-party country with which it does not

5    have an extradition treaty.

6              So it is a material omission by virtue of the fact

7    that they know that if Malaysia knew their true purpose they

8    would not surrender Mr. Hiya to the United States.

9              Now, it is also important, your Honor, because the

10   government has argued before this Court that -- and let me just

11   say we have obviously asserted that this was a ruse and that

12   the United States did not inform Malaysia about its true

13   purpose.  The government has not contested that.  I think that

14   it is effectively admitted in this proceeding, and they've put

15   forward no evidence to suggest that Malaysia had any awareness

16   of it.  In fact, Ms. McCann said we're under no obligation to

17   tell them.  That obviously distinguishes this case from what

18   happened in *Atta II*, but I will get back to that soon.

19             The other reason why it's important, your Honor, is

20   because the government is relying on an argument that Mr. Hiya

21   was not transferred pursuant to the extradition treaty, instead

22   that he was deported.

23             Now, why would Malaysia deport Mr. Hiya to the United

24   States?

25             Well, they would do so based on representations from

1    the United States that he is a United States citizen.  He's

2    wanted on a crime here.  That's the purpose of the transfer.

3              But we know, your Honor --

4              THE COURT:  People get folks who are United States

5    citizens in another country that we want on an alleged crime

6    here through extradition as well.  I don't read the treaty with

7    Malaysia, the extradition treaty as saying extradition is only

8    appropriate in these circumstances, but if it's a U.S. citizen

9    wanted in the U.S. for a U.S. crime, then we only go

10   deportation.

11             I guess part of this comes to another question that

12   perhaps is a bit premature, so I will throw it out there as

13   something I'm thinking about and, again, you respond when you

14   think it's most effective.

15             But in the first part of this two-part argument here,

16   you talked about the I idea that this was a material omission

17   and therefore a material misrepresentation because of the

18   treaty with Malaysia, and you spoke about what Malaysia would

19   or wouldn't have done or would have intended and the like.

20             But that -- and again this may be taking this out of

21   order -- but that speaks to this question of whether or not an

22   individual can have some cause of action to try to enforce a

23   treaty.

24             Isn't the issue that if Malaysia thought that the U.S.

25   was violating some agreement with Malaysia that Malaysia would

1  have to, you know, somehow appear or make itself known to the

2  United States as opposing this?  As far as I know Malaysia has

3  not done that.

4  　　　　So this whole thing about it's material because of how

5  it would have affected Malaysia, I would read into the lack of

6  any communication with Malaysia as saying that Malaysia doesn't

7  care, and I don't know that we can just assume what Malaysia

8  would or would not have done.

9  　　　　MR. BIALE:  Your Honor, I think you are raising the

10  standing issue that the government has brought up.  I think

11  that is a total red herring.  I will get to that.  It is

12  certainly in the outline.

13  　　　　But let me just say before we leave the subject of

14  whether Mr. Hiya was deported or not, as the government has

15  asserted, that is simply factually untrue.  They have no basis

16  to make that assertion.

17  　　　　What they are relying on for that is a communication

18  that the FBI requested Mr. Hiya's deportation.  That is at page

19  5 of the government's reply.

20  　　　　But we have provided actual evidence that Mr. Hiya was

21  not in fact deported from Malaysia.  That's Exhibit Z to our

22  opposition, which is a record from the Malaysian immigration

23  department stating that Mr. Hiya was not deported or expelled.

24  That is also the affidavit that I mentioned earlier of

25  Malaysian counsel, stating that under Malaysian law Mr. Hiya

OC9NHIYH

1  was not deported.

2          There was initially an attempt by Malaysia to deport

3  Mr. Hiya to Poland.  Why did they want to deport him to Poland?

4  Because that was the country whose passport he entered Malaysia

5  on.

6          They told him to get a ticket to go to Poland.  He did

7  so.  But then shortly before the flight, they canceled the

8  ticket at the behest of the Americans.  Okay?

9          So Poland would have been the country that Mr. Hiya

10  would have been deported to had he in fact been deported from

11  Malaysia.  There's no evidence in the record to suggest that he

12  was deported, and the evidence that is in the record

13  emphatically suggests that he was not.  Under Malaysian law he

14  was not deported.

15          So the government saying that, it is not factually

16  accurate.  Your Honor should not rely on that representation.

17          This is a case where Mr. Hiya we concede was not

18  extradited pursuant to the treaty.  He was not deported.  There

19  is really only one thing left, and it's consistent with the

20  facts here.  He was forcibly abducted from Malaysia and brought

21  to the United States.

22          So I just want to make those factual points all clear.

23          THE COURT:  All right.  But based on the government's

24  argument sort of the method -- well, if he was extradited, that

25  would be one thing, right?  Because that would have to be

1  following the requirements of our treaty with Malaysia, and any

2  other way that he gets here obviously, they are arguing he was

3  deported, but they also said that their argument is the same if

4  he is forcibly abducted, kidnapped, whatever language we want

5  to use.

6      MR. BIALE:  Well, their argument if he was forcibly

7  abducted, I think, as I understood it, was that if that's the

8  case, then the *Ker-Frisbie* doctrine applies and Mr. Hiya cannot

9  raise the circumstances in which he was brought here as a

10 defense to this proceeding, right?

11     That's what they said and that is in fact what is on

12 the screen right now.  But the *Ker-Frisbie* doctrine simply does

13 not apply to this case.  *Ker-Frisbie*, again, as I mentioned

14 earlier, is about criminal proceedings brought against an

15 individual in United States courts for crimes committed in the

16 United States.  That is the holding of *Alvarez* as well.

17     And, you know, the government concedes in its brief --

18 that is at page 7 of their reply -- that these defendants are

19 in a completely different posture from Mr. Hiya, because they

20 were brought here to face criminal proceedings in the United

21 States.  I agree with that concession.  That line of cases does

22 not apply to this situation.

23     The only case that we have really that applies to the

24 situation or the only two cases I think are *Atta* and *David*.

25     And in *Atta* we have this sort of two-part decision; we

1    have *Atta I* and *Atta II*.  And then in *David* we have the

2    district court's describe, which doesn't really describe the

3    facts.  There is a little bit more description in the Seventh

4    Circuit opinion that comes later.

5           But let me just go to the reasoning in *Atta I*.

6           So in *Atta I*, Judge Caden held that there were

7    essentially two reasons why extradition-out cases are different

8    than extradition-in.

9           I am going to cite some language from the decision on

10   page 20 to 21 of 1988 WL 66866.

11          Judge Caden quotes from *In Re David*.  He says, "In *In*

12   *Re David* Judge Foreman stated in the analogous area of

13   interstate extradition the rule has long been that one state

14   still has jurisdiction to try a criminal defendant even where

15   the defendant was forcibly abducted from another state by

16   agents of the state which eventually tried him," citing *Frisbie*

17   and *Ker*.

18          Judge Caden then says -- that is the end of the quote

19   from *David*.  Judge Caden then says, "This conclusion was

20   reached based on the rationale that 'due process of law is

21   satisfied when one present in court is convicted of a crime

22   after being fairly apprised of the charges against him and

23   after a fair trial in accordance with constitutional procedural

24   safeguards.'"  That is a quote from *Friesby*.

25          Judge Caden then says, and this is the important

1    point, "In an extradition proceeding designed to send the

2    defendant out of the United States, the court cannot assure

3    that the accused will receive due process.  For this reason,

4    application of the *Ker-Frisbie* doctrine to extradition cases

5    involving requests by other countries to extradite U.S.

6    citizens who have been brought illegally into the United States

7    violates due process."

8         Judge Caden did not go into what kind of process would

9    be due, what would occur in Israel.  That's for good reason

10    because there is a separate doctrine of noninquiry, which

11    prevents this Court from inquiring into those questions.

12         Judge Caden's holding on this front about procedural

13    due process concerns is reinforced by language in *Ker*.  In *Ker*,

14    the Court grounded its holding in the fact that the due process

15    of law here guaranteed is complied with when the party is

16    regularly indicted by a proper grand jury in the state court,

17    has a trial according to the forms and modes prescribed for

18    such trial, and when in that trial and proceedings he is

19    deprived of no rights to which he is lawfully entitled.

20         THE COURT:  Let me put this out there again to let you

21    know this is a thing I'm thinking about.

22         What use am I to make of the fact that there is a

23    pending United States case?  Meaning if this were purely the

24    U.S., you know, by hook or by crook sort of gets somebody from

25    Malaysia, they lie to them, they omit, they black ops, whatever

1  they do, and then promptly begin proceedings to send the person

2  to Israel, I think we are in that territory, how did we get

3  this person, what is going on here, let's do further inquiry,

4  it is concerning.

5         The existence of a passport case, whether it was -- I

6  don't want to say manufactured, whether that case was brought

7  as a pretext or not, there is an indictment by a grand jury

8  sitting in the Southern District.  So it is not a sham in that

9  way.

10        It is not that they just claimed there was a charge

11  and really there wasn't one, even if that charge were brought

12  expressly to legitimize this process.

13        How, if at all, do I overlay that with *Atta*?  The

14  issue in *Atta* seems to be the section which I have out and

15  marked in my review of the case as well, is that if the person

16  is, you know, call it kidnapped for the purpose of bringing

17  them here from one state to the other, whatever it is, they

18  know that they are going to get due process in a criminal

19  proceeding because it is here.

20        If they're kidnapped, as in *Atta* -- again, I am using

21  this language just as a shorthand -- for the purpose of sending

22  them elsewhere, we don't know what's going to happen elsewhere

23  and that's why due process becomes a concern or the due process

24  concerns come to the for.

25        But here he does have a U.S. case, where presumably --

1    it is a case here in the Southern District of New York -- he

2    would be getting due process.

3           How does the existence of whatever the case number is

4    for the passport case, how does that overlay with *Atta*?

5           MR. BIALE:  I think -- and I probably will end up

6    eating my words when this issue comes up in the passport fraud

7    case, I think because of *Ker-Frisbie* and *Alvarez*, Mr. Hiya

8    would not be able to raise these circumstances of how he was

9    brought here as a defense to that case.  He can't move to

10   dismiss the indictment as a defense to that case.

11          Now, I will just say as a footnote, your Honor, the

12   circumstances under which he's brought here are at issue in

13   that case, and Judge Marrero has remanded to Judge Netburn to

14   hold an evidentiary hearing on those circumstances because the

15   collusion between the United States and Malaysian officials in

16   that case could have Fourth Amendment implications that relate

17   to the seizure of Mr. Hiya's devices.

18          THE COURT:  I will describe for the record briefly, I

19   don't think it matters, just in the interest of transparency,

20   it's common that judges will sometimes phone a friend and

21   discuss issues.  I did get a call from Judge Netburn about

22   exactly that hearing.

23          We spoke briefly, and as it soon as it was clear that

24   it was connected to this case, in an abundance of caution I was

25   like,, oh, I have the extradition perhaps we shouldn't talk.

 1          We got no further than her saying enough for me to

 2    figure out that it was Mr. Hiya's case.  Again, I don't think

 3    it has any effect on anything, and frankly we probably could

 4    have discussed things about the hearing, but I did demur

 5    because I was connected to this case, but thank you.

 6          MR. BIALE:  Fair enough, your Honor.

 7          I didn't mean to cause problems by raising it.  I

 8    bring it up just because the different postures are significant

 9    and what kinds of arguments Mr. Hiya can raise in this

10    proceeding versus that proceeding are governed by different

11    lines of case law.

12          To take your Honor's hypothetical, I think if you had

13    a situation where Mr. Hiya is in Malaysia, the United States

14    discovers that, the United States brings a passport fraud

15    charge against Mr. Hiya, for whatever reason the United States

16    decides it's worth their while to send three agents across the

17    globe to pick someone up for a zero- to six-month passport

18    fraud case and bring him here -- by the way, I will just note,

19    and this is in the record that we have put before the Court,

20    when they brought him here on the plane and attempted to

21    question him, they only asked him questions about the Israeli

22    case, not about the passport fraud case.

23          Okay.  But let's say that all happened.  He comes

24    here, he stands trial in the Southern District of New York in

25    front of Judge Marrero, he's convicted or acquitted on the

1   passport fraud case.

2           Then subsequently Israel says:  Oh, you know what, we

3   have a case against him.  We want to bring an extradition

4   proceeding so that when your case is done, bring him over here

5   and we will try him for our case.

6           That would be a totally different situation.  I think

7   in that hypothetical the Court clearly could say, look, it's

8   easy to disentangle these two issues because they are totally

9   unrelated to each other.

10          Here it is impossible to disentangle those, and it's

11  impossible to disentangle them because we have a record of

12  Israel and the United States colluding with each other to get

13  Mr. Hiya from a country that does not have an extradition

14  treaty with Israel, and then we have the actions of the United

15  States vis-a-vis Malaysia -- I have an extra pen, your Honor.

16  I want you to take notes on what I am saying.

17          THE COURT:  Thank you very much.

18          MR. BIALE:  So you have all of that.  You have a

19  factual record before you that makes this case like *Atta I*,

20  right?

21          Even though I concede that in *Atta I* there was not a

22  prosecution in the United States.  That is a point of

23  distinction.  But the facts as they were presented to

24  Magistrate Judge Caden in *Atta I* were basically on all fours

25  with this case.

1    It was alleged there was a ruse, that because

2 Venezuela did not have an extradition treaty with Israel, the

3 United States government contrived to bring him here by

4 forcible abduction.  That is what Magistrate Judge Caden was

5 concerned about.

6    To go back to my description of his decision, there

7 was a second reason that he cited for concern.  There was the

8 procedural due process issue that he raised.  Then there were

9 also concerns that he had about the law of foreign relations.

10 He said this would force the Court to take sides and place the

11 interests of Israel over the interests of American citizen.

12    Now, this point is important I think because of

13 something that Judge Korman later says in *Atta II*.

14    So then we get to *Atta II*.  The United States brings a

15 new extradition proceeding.  It is on completely different

16 facts that basically sort of cure the problems that occurred in

17 *Atta I.*

18    If you look at Judge Weinstein's habeas decision and

19 the Second Circuit's affirmance of it, it really grounds the

20 jurisdictional point on the fact that *Atta* was properly

21 deported from Venezuela.

22    That's what the government wants you to do here, even

23 though there's no evidence to support the fact, to support the

24 assertion that Mr. Hiya was properly deported.

25    So *Atta II* is distinguished on its facts.  But,

1    importantly, Judge Korman also dismissed the concerns about

2    foreign relations by saying, and this is a quote from *Atta II*,

3    This case does not involve either "the infringement of a

4    foreign nation's territorial sovereignty, which results from

5    unlawful seizure and abduction of persons" -- that is a factual

6    case -- or "a possible affront to the foreign nation's

7    sovereignty which results from obtaining the surrender of a

8    defendant under false pretenses."

9         That's from *Atta II*, 706 F.Supp. at 1038.

10         Judge Korman didn't pull that out of thin air.  That

11    is from a Second Circuit case called *Fiocconi v. Attorney*

12    *General*.  Let me get you the cite for that one.

13         THE COURT:  I believe my law clerk has it.

14         MR. BIALE:  Then we are good.  That was a case where,

15    similarly, an individual was extradited -- or I'm sorry,

16    withdrawn -- was brought here not pursuant to an extradition

17    treaty.

18         THE COURT:  Let me just put it in the record so that,

19    one, it is on the transcript and, two, the government is

20    directed to it.  *Fiocconi v. Attorney General*, 462 F.2d 475,

21    Second Circuit.

22         MR. BIALE:  Thank you, Judge.  That was a case where

23    an individual was brought here.  He was not subject to an

24    extradition treaty, but was just an exercise of international

25    comity.

1          The Second Circuit said under the line of cases coming

2     from *United States v. Raucher*, which was decided on the same

3     day as *Ker* by the same justice, that it was permissible to

4     surrender an individual pursuant to comity even if it was not

5     in accord with a specific extradition treaty so long as there

6     was not what the Court called a possible affront to the

7     country's sovereignty as a result of an alleged breach of faith

8     with its act of comity.  That is the part of *Fiocconi* that

9     Judge Korman was citing.  It's footnote 9 of the opinion.

10          And that's precisely what happened here, Judge.

11          The United States' actions in this situation was a

12     ruse.  It was a deception of its sovereign partner in Malaysia.

13     That is an affront to Malaysia's territorial sovereignty and to

14     principles of international comity.  We know that another piece

15     of evidence that points to that is the language of the treaty

16     it sell, right?

17          So even if Mr. Hiya does not have standing to raise a

18     violation of the treaty, and even if the treaty was not

19     violated here on its terms because he was not extradited, I

20     think the Court can look to the treaty as clear evidence that

21     what the United States did here was to bring Mr. Hiya under

22     false pretenses in violation of its relationship with Malaysia.

23          Now to the question of standing.  The government cites

24     *Barinas,* which is a Second Circuit decision, to argue that

25     Mr. Hiya does not have standing to raise a violation of the

1    treaty.  We really don't quibble with that argument.  Because

2    what we are talking about here is not a situation where someone

3    was extradited pursuant to a treaty and is raising a rule of

4    specialty objection to their prosecution here.

5           The rule of specialty, as the Court knows, is a rule

6    that says you can only be tried here for the crimes on which

7    you are extradited.  *Barinas* holds that an extraditee

8    surrendered pursuant to an extradition treaty does not have

9    standing to raise that kind of rule of specialty defense or

10   objection to charges other than the ones for which he was

11   brought here.

12          The other cases cited by the government stand for

13   exactly the same principle.  *United States v. Bankman-Fried*,

14   the issue there is that the government charged

15   Mr. Bankman-Fried with charges that were not part of the

16   extradition agreement with, I think it was the Bahamas in that

17   case.  *United States v. Herbert*, which the government cites

18   repeatedly, same issue.

19          By contrast, all of the cases that deal with forcible

20   abduction -- and here I am going to loop back to the

21   *Ker-Frisbie/Alvarez* line -- they all presume that the defendant

22   has standing to challenge the method in which he was brought

23   here, right?  There's no question as to standing in those

24   cases.

25          THE COURT:  Let me just ask one point on that.  You

1    are sort of drawing this distinction between what we

2    traditionally think of as the rule of specialty in terms of

3    what are the offenses for which a person is extradited.

4          There's certainly a clear line of cases, as we just

5    talked about that says unless there's sort of, you know that

6    the person does haven't standing with respect to that, but in

7    the U.S.-Malaysia treaty it does list under their subsection

8    about rule of specialty, which is Article 16, that this concept

9    that the person can't be then sent to another country that, at

10   least for this treaty, is defined as part of the rule of

11   specialty.

12         So I think that while it is not always seen as --

13   normally the traditional idea of rule of specialty is just what

14   are the offenses, this particular treaty includes the idea of

15   not sending them to another country once the U.S. receives them

16   or I suppose Malaysia receives them as part of the rule of

17   specialty.

18         Does that matter?

19         MR. BIALE:  Putting aside questions of whether, sort

20   of -- I think of about this as like a statutory interpretation

21   question.  Does the title of the statute matter?  Sometimes the

22   Supreme Court says it doesn't matter at all, don't look at

23   that; sometimes they -- you know in that recent aggravated

24   identity theft case, they said, well, it's called aggravated

25   identity theft.  So you can go in sort of both directions on

1   that.

2           But I think it doesn't matter here, your Honor,

3   because that provision of the treaty says -- and maybe we

4   can -- can we have Section 16(2) of the treaty brought back up?

5           While it's coming up, it says -- it says -- that was

6   it -- a person extradited under this treaty shall not be

7   extradited to a third state for an offense committed prior to

8   his surrender unless the surrendering state consents.

9           I think, based on that language, had Mr. Hiya been

10  extradited pursuant to the treaty and then came here and said:

11  This is isn't right.  I was extradited, and they're trying to

12  extradite me to a third country, the treaty says that they

13  can't do that.

14          Then the government would say, Well, you don't have

15  standing in the Second Circuit under *Barinas*, right?

16          Now, footnote, but it is an important footnote, I

17  think *Barinas* was wrongly decided.  It is totally inconsistent

18  with the Supreme Court's decision in *Raucher*.  The majority of

19  circuits that have addressed the question of standing with

20  respect to extradition treaties have come out the other way.

21          I think we pointed your Honor to a number of those

22  cases.  One recent one is *United States v. Fontana*, 869 F.3d

23  446 (6th Cir. 2017).  If you are going to rule against us on

24  standing grounds, I think that we would ask that you say it's

25  because of *Barinas* and then we can preserve that challenge for

1     another day.

2              Two other points about *Barinas,* your Honor.

3              First of all, it did not overrule *Fiocconi.*  In fact,

4     it cites it favorably throughout the decision.  It also

5     obviously did not purport to overturn *United States v. Raucher*,

6     because that is a Supreme Court decision.

7              So to the extent those two cases still have vitality,

8     and I think they do, they made clear that the holding of

9     *Barinas* is limited to this situation where someone who is

10    extradited pursuant to the treaty is raising a rule of

11    specialty objection to particular charges, right?  Because

12    *Fiocconi* makes clear that the individual has standing for what

13    it calls a judicial remedy to raise this affront to comity.

14             Okay.  Then, lastly, I just want to say that the

15    standing issue is really not relevant to jurisdiction.

16    Jurisdiction was not challenged in *Barinas*.  It is not a

17    Section 3184 case.  It is, you know, a classic, "they bring me

18    here to face charges in the United States" kind of case.  *I*

19    think that that all of the standing issues that the government

20    raises, as I said at the outset, are really a red herring.

21             I think I've sort of said what I want to say about

22    jurisdiction.  I know I've taken a long time.  Let me just, if

23    I can have your Honor's indulgence, let me confer with

24    Ms. Harris.

25             MR. BIALE:  My wise cocounsel brings up a point that I

1    wanted to make but hadn't made.  So I just want to end by

2    talking about -- so toward the end of the government's argument

3    the government argued that, even if *Atta I* applies, and even if

4    there is some due process governing this proceeding, Mr. Hiya's

5    allegations don't rise to the level of torture or shocking

6    conduct that were at issue in *Toscanino*.

7            That is wrong as an argument for a couple of reasons.

8            First of all*, Toscanino*, as the government said, is an

9    exception to the *Ker-Frisbie* doctrine.  I've talked kind of ad

10   nauseam now about why the *Ker-Frisbie* doctrine does not apply.

11   I don't think there's any reason to import the *Toscanino*

12   standard into the 3184 context and into Judge Caden's decision

13   in *Atta*.

14           Judge Caden's decision in *Atta* is really concerned

15   with procedural due process.  The *Toscanino* standard of

16   shocks-the-conscience-type concerns, that is a violation of

17   substantive due process, right?  And what *Toscanino* held is

18   even under the *Ker-Frisbie* line of cases, if there is conduct

19   here that so shocks the conscience that it rises to the level

20   of a substantive due process violation, then there may be an

21   exception to the *Ker-Frisbie* rule.  That, again, is really not

22   relevant to this case.

23           THE COURT:  What do we do then with *David*, right?

24   We've discussed the fact that there is this line of cases that

25   are criminal in nature where people came here and they had U.S.

1    cases, and that we have very few examples in the extradition

2    context.  It seems like *Atta* and *David* are the only ones.

3         *David* definitely is using the *Toscanino* sort of

4    *Ker-Frisbie* exception.  Its analysis of whether or not someone

5    can be black ops, you know, whatever, sort of brought here,

6    kidnapped, whatever language you want to use, if these the only

7    two cases you have, I understand that at *Atta* may be analyzing

8    it differently, but *David* definitely speaks to *Toscanino*.

9         MR. BIALE:  It does.

10        I think that the *David* Court was wrong to import that

11   standard into this context, because for all the reasons that I

12   have described, there really is no authority to apply

13   *Ker-Frisbie* and *Toscanino* in an extradition-out case.

14        This Court is obviously not bound by the decision in

15   *David*.  It's out of circuit.  There's nothing really that --

16   the Court is operating on, I wouldn't way a blank slate, but a

17   minorly drawn-on slate here.

18        It is also distinguished based on the facts.  I think

19   if you look at the Seventh Circuit's decision in *David*, the

20   Seventh Circuit is very clear to emphasize that there is no

21   allegation here of any collusion between the United States and

22   France.  I don't think there is any allegation that the United

23   States tried to conceal from Brazil that its true purpose was

24   to extradite Mr. David to France, and I don't think you can

25   plausibly say that that was the purpose.

1          I mean, *David* is actually more like the hypothetical

2     that I raised before where they bring someone on U.S. charges,

3     the person is tried or deals with those U.S. charges, and then

4     later there is a request from a third country to extradite the

5     person.  That's really the situation in *David*.

6          It's totally different from this case.  The point in

7     *Atta I* is that what Judge Caden said -- and I think that this

8     Court should have the exact same concerns -- is that because

9     there are no due process protections that it can rely on in the

10    third country, in this case Israel, and because the due process

11    protections in this extradition hearing are so limited -- in

12    fact the government says there are none -- the Court simply

13    cannot ignore the process by which an individual was brought

14    here unlawfully to face extradition to a third country.

15         I think this case is in that respect on all fours with

16    Judge Caden's decision.  That is really the only precedent that

17    is directly applicable, and we think that that is the decision

18    Court should apply when considering its own jurisdiction.

19         THE COURT:  Thank you.

20         MS. McCANN:  Your Honor, if I may, before moving on to

21    probable cause, just briefly respond to some of the arguments

22    Hiya has made.

23         To put it plainly, your Honor, the arguments that Hiya

24    is raising are red herrings.  Hiya starts out with this

25    distinction between subject matter jurisdiction and personal

1  jurisdiction and says that the *Ker-Frisbie* doctrine applies to

2  one versus the other.

3          To be clear, we are not invoking the *Ker-Frisbie*

4  doctrine.  We are simply responding to the arguments that Hiya

5  has made.  Our position here is that due process is not a

6  consideration in this extradition proceeding, period.

7          To the extent the Court wants to apply it, the

8  *Ker-Frisbie* doctrine still lends in the government's favor.

9          Here jurisdiction squarely falls under Section 3184.

10  There is no factual dispute that Hiya was in New York at the

11  time that we filed the complaint and provisional arrest

12  warrant.

13          Because Hiya was found in New York, this Court has

14  jurisdiction, not only subject matter jurisdiction, which we

15  think is captured under element one, whether this Court has

16  jurisdiction over this proceeding; and personal jurisdiction

17  under element two, which is whether this Court has jurisdiction

18  over Hiya.

19          Your Honor, we also want to point your attention to I

20  believe a case that may have been cited in our reply brief.  We

21  would agree with Hiya that, again, this is not a criminal

22  proceeding.  It's not a civil proceeding.  It is a

23  miscellaneous proceeding in which the typical rules do not

24  apply.

25          But, your Honor, taking that in context, courts have

found that in such proceedings, the manner by which a person is found within a Court's jurisdiction does not absolve the Court of jurisdiction over the person or over the proceeding.

The case that we would like to direct your Honor's attention to is *Immigration and Naturalization Service V. Lopez-Mendoza*. The case citation is 468 U.S. 1032 (1984). In that case the individual was challenging his deportation proceedings. He alleged Fourth Amendment violations to say that because he was illegally arrested that the Court did not somehow have jurisdiction to hold his deportation proceeding or to have him stand for deportation.

The Supreme Court disagreed. They said that the presence or the identity of a person is not suppressible as a fruit of an unlawful arrest.

THE COURT: Isn't that a different issue, though?

There the question is, you are talking about the Fourth Amendment, right? The issue is there has to be a Fourth Amendment violation, but there also has to be something that was in fact suppressible.

There the ruling you is can't suppress the person's existence. The issue of does the Court properly have jurisdiction over them, it doesn't actually seem -- I have to obviously look at the case, but it doesn't seem like that is what that case turned on.

Whereas here, not just the extraditee's arguments, but

1   the governing statute lays out that the Court must have

2   jurisdiction.  I don't know that that case really helps much.

3           Obviously I will look at it, and I noted down the case

4   number.  But the idea that you can't suppress someone's

5   identity, that is a different issue than does the Court

6   properly have jurisdiction over the person.

7           MS. McCANN:  Right, your Honor.

8           I appreciate your Honor's distinction in that respect.

9           I think the key point with respect to that case is

10  that there is a statute that plainly says that if a person is

11  found within this Court's jurisdiction that this Court has

12  jurisdiction over that person.  And that is the jurisdictional

13  basis in this case.

14          THE COURT:  I take your point on immigration that if

15  you are found in the United States, however you may have gotten

16  here, the United States has jurisdiction over you.

17          But this is not an immigration proceeding or a

18  criminal or a civil.  We are in separate land, miscellaneous

19  extradition land.

20          Is it that clearcut in the extradition context?

21          You just said there is a case in immigration that says

22  if you are found in, we have jurisdiction.  Yes, that's

23  correct.

24          Is there a case that says merely being here is the end

25  of the inquiry for extradition purposes?

1          MS. McCANN:  Your Honor, I believe that there is a

2     case that outlines whether due process can -- one moment, your

3     Honor.

4          THE COURT:  Of course.

5          MS. McCANN:  Your Honor, we would submit, as we have

6     before, that the sole basis for jurisdiction is under the

7     statute.  The statute should be read plainly, and it should be

8     applied plainly.

9          Because Hiya was found in this Court's jurisdiction,

10    this Court has jurisdiction not only over the proceeding but

11    over Hiya.  Now, to the extent that Hiya wants to make due

12    process arguments, we believe that there are other forums where

13    he can make that argument.  One would be the criminal

14    prosecution in that proceeding.  Another consideration would be

15    before the Secretary of State, because, again, this Court has a

16    limited scope.

17         THE COURT:  Let me ask to that point only, because it

18    was raised by the extraditee the idea that, if the conclusion I

19    am to take from *Atta*, if the concern of Judge Caden in that

20    ruling was, the problem with *Atta* was because *Atta* was going to

21    be sent to a country where we don't know if there's going to be

22    due process, it may be a different situation than where there

23    was definitely going to be due process.  Defendant has raised

24    this issue that they in fact won't be able to raise some of

25    these questions in the criminal proceeding.  And you yourself

1    just referenced the idea that to the extent that how he got

2    here is an issue, there will be other forums for him to raise

3    it.

4            Does it matter, as defendant said, that he may not be

5    able to raise how he was brought to the United States in the

6    criminal proceeding?

7            Does that matter?

8            MS. McCANN:  No, your Honor, it doesn't matter,

9    because in this proceeding Hiya may still raise those

10   arguments.

11           Even to the extent that your Honor issues a

12   certificate of extraditability, there is a process by which

13   Hiya can raise those concerns with the Secretary of State.

14           Again, the Secretary of State has that final decision

15   making power.  The Secretary of State reviews the extradition

16   hearing *de novo*.  They review the materials *de novo*.  They have

17   broad discretion to either move forward with the extradition or

18   not.  So it does not matter whether or not Hiya can raise those

19   concerns in the criminal prosecution, because even in this

20   proceeding there a separate forum for those arguments.

21           We also want to highlight that Hiya has continued to

22   use this phrase of forcible abduction, your Honor, but Hiya was

23   not forcibly abducted in this case.

24           We want to direct your attention to Exhibit AA, which

25   was filed by the fugitive.  In that document it's clear that

1  the Royal Malaysian Police transferred custody to the United

2  States.

3         There was no secret that Malaysia was transferring

4  custody to the U.S.  The U.S. did not go get Hiya under some

5  false pretense or without Malaysian police knowing when the

6  document clearly reflects that Malaysia voluntarily transferred

7  custody of Hiya to the U.S.

8         THE COURT:  I didn't hear them as arguing when they

9  were sort of using this, whatever language you were using to

10  describe how he got brought here, I didn't hear them arguing

11  that it was sort of under cover of night the U.S. crossed into

12  sovereignty territory and kidnapped him in that way.

13         What I heard them saying is that, one, he was

14  obviously not formally extradited through the treaty and that

15  he also was not in fact deported.  And they spoke to the idea

16  that there's nothing in the record that would indicate that

17  deportation was in fact the method by which he was brought

18  here.

19         So I don't know that Exhibit AA really addresses the

20  point that they were trying to make.  Again, your argument all

21  along today has been it sort of doesn't matter how he got here,

22  that he's here, ergo, that's enough for factor two under the

23  statute.

24         MS. McCANN:  Yes.  I think that's right.

25         I think we want to address this general argument that

1    there was some purpose to evade the U.S.-Malaysian extradition

2    treaty or to somehow evade Malaysian authorities to bring Hiya

3    over here.

4              That's simply not true or supported by the document.

5              THE COURT:  All right.

6              As to that what I heard in their argument was -- I'll

7    call it lack of candor -- the omissions as they allege in the

8    United States government's communication with Malaysia, meaning

9    not indicating to Malaysia that Mr. Hiya was also a citizen of

10   Israel, not indicating that Israel also wanted him, and deep

11   down it was really the intention of the United States to send

12   him to Israel.

13             That's what I heard in their arguments about the

14   affront to the sovereignty of Malaysia.  Not that they stole

15   him from Malaysia, but that whatever it is that led to Malaysia

16   handing him over to the United States, clearly it wasn't an

17   extradition.  Is it a deportation?  Is it just international

18   comity?  Who knows?

19             But what they are alleging was that the U.S.

20   government was deceptive in their communications with Malaysia

21   and deliberately withholding the fact that really what this was

22   all about was the attempted murder in Israel.

23             MS. McCANN:  Your Honor, it is just simply not true.

24             THE COURT:  It is not that true that that information

25   was withheld, or it doesn't matter?

1      MS. McCANN:  I believe it is not true that the

2 information was withheld, but also that it doesn't matter.

3      It is not true in fact and I don't believe it's true

4 in law.

5      I will walk this just twofold just briefly.

6      Hiya has raised no authority requiring the U.S. to

7 inform Malaysia of an impending extradition request.  But in

8 fact the documents reflect that there may have been some

9 communication to Malaysia on this.  I can't make

10 representations, as I'm not a part of the criminal prosecution,

11 I can't make representations about what the U.S. agents may

12 have told Malaysia or not.

13      THE COURT:  You say there's some evidence that there

14 may have been communication.

15      What is that?

16      What are you pointing to?

17      MS. McCANN:  Your Honor, for example, in Exhibit H

18 that is Jane 10, 2024, communication from the FBI to Malaysia,

19 this is a document that Hiya cited as scrubbing Israel from

20 communications to Malaysia.

21      Even in this document there is a quote that Hiya was

22 recently relocated to Malaysia in order to evade an ongoing

23 feud with Israeli crime families.  So this notion that the U.S.

24 somehow evaded this treaty by concealing the fact that Hiya was

25 wanted in Israel is just simply not supported.  It is not

1    suggested in the documents.

2           THE COURT:  Evading an ongoing feud with a crime

3    family doesn't necessarily mean that the country wants him to

4    charge him with a crime.  I don't know.  Someone can be a

5    target of a crime family because you witnessed a crime that

6    they committed.

7           I don't know that this particular document speaks to

8    full candor with Malaysia.  Again, I take your point that maybe

9    it doesn't matter and pretext is maybe okay.

10          MS. McCANN:  Yes.  Sure.

11          Your Honor, I think to that point, that's the crux of

12   the argument is that there's no authority that prosecutorial

13   discretion or the timing of when an extradition request comes

14   in, there is no authority that requires or that supports a

15   basis for a due process violation.

16          That there was an extradition request at a certain

17   time, and we brought passport fraud charges at a certain time

18   does not mean that there is a due process violation, and Hiya

19   has not put forth any authority to support that basis.

20          So, your Honor, we would submit that not only is it --

21   you know, I take your Honor's point that you may not see it

22   from the documents, but even in law, as we mentioned initially,

23   the existence of an extradition treaty does not require the

24   U.S. to invoke it.

25          This argument was rejected -- and I think Hiya may

OC9NHIYH

1    have raised this case -- in the *U.S. v. Herbert* case.  In that

2    case the defendant alleged that his extradition violated the

3    treaty between the U.S. and Belize, and conceded that there was

4    a pending extradition request, and that because he was

5    kidnapped in Belize by Belizean authorities and expelled to the

6    U.S. that there was somehow some violation of the treaty, of

7    the extradition treaty.

8            The Court concluded that because the defendant was not

9    transferred to U.S. custody under that treaty, that there can't

10   be a violation of it.  I think, your Honor -- I know we've

11   belabored this jurisdictional point, but I just want to put it

12   plainly.  Hiya cannot argue a forcible abduction, or this

13   argument at the same time as arguing a violation under an

14   extradition treaty.

15           There was no extradition that took place from

16   Malaysia, and there are no documents to support that we invoked

17   the treaty in transferring custody from Malaysia.

18           THE COURT:  I don't think there is a dispute as to

19   that.

20           The use to which I thought the extraditee was using

21   the treaty was merely to talk about I suppose questions of

22   sovereignty, right?  The idea of what's important to Malaysia

23   and the fact that that kind of language that's under their rule

24   of specialty Article 16 section is in there speaks to the

25   idea -- their theory -- that the U.S. was deliberately

1 misleading Malaysia because if Malaysia had known that Israel

2 wanted Mr. Hiya, they may not have turned him over.

3 I certainly didn't hear them arguing this was in fact

4 an extradition and we are now bound by that treaty. I took

5 that merely to be an indication of these are the types of

6 things that Malaysia cares about. Therefore, when we are

7 thinking about the language that they are talked about, the

8 affront to sovereign immunity -- not immunity, sovereign

9 whatever -- that I should look to the treaty as evidence of

10 what Malaysia is concerned about.

11 MS. McCANN: I think the point we are making, your

12 Honor, is exactly that. Is that what Malaysia cares about is

13 immaterial in this proceeding, because the extradition treaty

14 has not been invoked.

15 Hiya wants you to believe that extradition treaties

16 govern the relationship between the U.S. and Malaysia. That's

17 not true -- or the U.S. and whoever the country that has the

18 extradition treaty. That's simply not the case. Extradition

19 treaties govern extraditions. That is the scope of an

20 extradition treaty between the U.S. and a another nation.

21 As I mentioned before, Hiya cannot identify a single

22 authority requiring Malaysia's consent for this Court to

23 certify his extradition. The only authority requiring

24 Malaysia's consent would be the U.S.-Malaysia extradition

25 treaty. That's why I've raised the extradition treaty as kind

1    of the basis for that argument.

2            Your Honor, we also want to make clear that there is

3    no basis for this argument regarding a sham passport fraud case

4    or investigation.  Hiya has raised no basis for that, and it's

5    simply not the case.  I think as you have seen in our

6    briefing --

7            THE COURT:  I think their argument -- the use of the

8    word "sham" even under theory may not be the right term.

9    Certainly what I heard them strongly arguing is the idea that

10   the U.S. passport fraud case was a pretext, that the timing of

11   when the United States supposedly started talking to Israel

12   about the whereabouts of Mr. Hiya, the timing of when Israel

13   issued a warrant for him, when the red notice was issued, when

14   he was in fact detained under whatever in Malaysia, all

15   predates the passport fraud warrant, that the timing alone sort

16   of shows clearly Israel wanting him for attempted murder came

17   first.

18           The U.S. was communicating with them about that and

19   then gets this passport fraud case afterwards.  So I don't see

20   their arguments to say that the passport fraud case isn't real,

21   but that it was a pretext, that that case was brought in order

22   to effectuate their ability to get Mr. Hiya here.

23           MS. McCANN:  Again, your Honor, there is no authority

24   for that argument.  There's no authority that pretext or

25   prosecutorial discretion is a basis nor a due process

1    violation.

2          Timing can just be circumstantial, and they've offered

3    no legal authority to say that because there was timing between

4    the criminal prosecution and the extradition request that

5    somehow there's a due process violation.

6          Because there is no authority, your Honor, we would

7    submit that that does not absolve this Court's jurisdiction.

8          MR. BIALE:  May I just very, very briefly --

9          THE COURT:  Let me just --

10          Were you done on your jurisdiction issues?

11          If so, I believe extraditee had a brief surreply

12    before we move on to probable cause.  But I didn't want to cut

13    you off if there was more in response to their argument that

14    you wanted to say.

15          MS. McCANN:  Your Honor, I just wanted to briefly

16    address the standing argument.  I think we've outlined this in

17    briefings quite a bit, but, again, the extradition treaty, to

18    the extent that it even applied in this case, which it does

19    not, Hiya does not have the ability to raise a violation under

20    a treaty to which he's not a party.

21          That comes from the *Barinas* case.  It is outlined in

22    briefing, but I wanted to make clear that there is a circuit

23    split, but the Second Circuit has been clear that an individual

24    who is not a nation party to a treaty cannot raise an alleged

25    violation under it.

1            THE COURT:  Mr. Biale.

2            MR. BIALE:  Very briefly.  I can do it from here.

3            I am not going to go back over the legal arguments.  I

4    just want to point the Court to the evidence of, I think we

5    called it the scrubbing of documents that were sent to

6    Malaysia.  We described that at pages 4 and 5 of our brief.

7            The chronology of events that I discussed before is

8    really at pages 8 to 12 in our brief.

9            I would just point the Court, if you look at Exhibit

10   J, the last page has biographical data on Mr. Hiya that the FBI

11   provided to Europol, which has his date of birth.  It says U.S.

12   citizen, it has numbers, Israel, it has his Israeli passport

13   number, Moroccan, etc.

14           If you look at basically the same information on

15   Exhibit H, which is a document that the FBI provided to

16   Malaysia, it has the same biographical data, but it says Eran

17   Hiya, date of birth, passport and visa information, U.S.

18   citizen, and it lists the numbers, and then it says Moroccan,

19   Turkey, UAE.  They took out Israel from the biographical data.

20           MS. McCANN:  Your Honor, I would have to object to the

21   notion that we have taken out communications when there is no

22   evidence that we've taken out --

23           MR. BIALE:  It's nothing --

24           THE COURT:  I hear that you disagree with the

25   conclusion that --

OC9NHIYH

1        MS. McCANN:  It is just the characterization of "taken

2    out" suggests that they've seen some original communication.

3        THE COURT:  The argument is there are two examples of

4    documents where the United States has identified Mr. Hiya.

5        One of them includes a number of countries, including

6    Israel.  The communication sent to Malaysia notably does not

7    include Israel.

8        I will draw my own conclusions about why that may be

9    or not be, and then the second question of whether or not it

10   matters.

11       MR. BIALE:  Sure, your Honor.

12       You know, look, I will just add to that point, the

13   government has the evidentiary burden here.  They have gotten

14   up and said, oh, we did tell Malaysia.  They knew about the

15   Israel situation.

16       I mean, that is sort of what I heard.  They said we

17   haven't produced evidence, sufficient evidence that it was

18   concealed from them, and I think that she said and in fact it

19   is not true.

20       Well, if in fact it is not true, the government can

21   produce evidence to --

22       THE COURT:  The largest part of the government's

23   argument that I heard is that they don't think it matters.

24       MR. BIALE:  I'm sorry.

25       THE COURT:  Whether we're black ops-ing, which is

1  really not what is going on here, or lying to Malaysia or

2  deporting or whatever it is, that it does not matter because as

3  long as he is here that this Court has jurisdiction over him.

4          MR. BIALE:  Understood, your Honor.

5          The last thing I will say, just because I hear you

6  don't like sham passport fraud, another way of thinking about

7  it is the tail that wags the dog.  That's perhaps a more apt

8  phrase.

9          I do think, contrary to the government's argument, we

10  have cited authority for why that matters.  That's *Atta I*,

11  that's *Fiocconi*, and the other cases that are cited in our

12  brief.

13          With all that said, on the jurisdictional point, I'll

14  rest on our papers.

15          THE COURT:  Thank you very much.

16          MS. McCANN:  Your Honor, may I just check before

17  moving on to probable cause?

18          THE COURT:  Yes, of course.

19          MR. BIALE:  What would the Court think about a

20  five-minute bathroom break?

21          THE COURT:  Sure why don't we do that.  We'll break

22  for just five minutes.

23          You can stand up, consult if there is a last point

24  that perhaps you're consulting what that you want to make on

25  jurisdiction.  I will be happy to hear that as well, or we can

1  just move right into probable cause when we come back.

2          MR. BIALE:  Thank you, your Honor.

3          MS. McCANN:  Thank you, your Honor.

4          (Recess)

5          MS. McCANN:  Your Honor, we had a chance to just

6  briefly confer with Hiya's counsel during the break.  We

7  anticipate that both of our remarks on probable cause will be

8  very brief.  We will just highlight the key points on our

9  respective arguments, and then address any questions that your

10 Honor might have.

11         THE COURT:  Let me just say I do not mind long

12 arguments as long as they are helpful and thoughtful.  At one

13 point during today's proceeding -- I don't way which of the two

14 of you was standing, it could apply to either one -- I Teamed

15 my law clerk and said, "Good lawyering is its own reward."

16         So I think certainly the parties here have been very

17 thorough.  The briefs were helpful.  The oral argument has been

18 helpful.  I'm still mulling over one or two issues, but that is

19 not your fault.  You certainly addressed the point, but I am

20 trying to decide how I am going to do that.

21         MS. McCANN:  We appreciate that, your Honor.

22         THE COURT:  Certainly fine to go long if it's helpful,

23 but I appreciate that we don't think the next part will go as

24 long.

25         MS. McCANN:  On probable cause, your Honor, we believe

the applicable standard pursuant to Section 3184 is that the

Court must only find that the evidence is sufficient to sustain

the charge.

So in this extradition proceeding context, we believe

that that's essentially the same standard that's in used in

federal preliminary hearings in the same inquiry that would be

used for the issuance of an arrest warrant or a search warrant.

So I won't go through the facts in great detail, but

the charges Hiya is wanted for are charges involving attempted

murder, conspiracy to commit a felony, unlawfully, possessing,

carrying, or transporting weapons, changing the identity of a

vehicle or vehicle part and destruction of evidence.

So between January 2022 and January 2024, the evidence

shows that members of Hiya's gang committed serious criminal

offenses against a rival gang leader and its members.  So the

evidence to support these crimes comes in a number of different

forms.  Those forms include statements from cooperating

witnesses, that who are referred to in our brief as AA and BB.

Those statements show a number of things, including

that one of the cooperating witnesses, AA, met in person with

Hiya several times, including several months before the murder

attempt, that AA communicated with Hiya through a cell phone

that was used for the distinct purpose of communicating

discreetly with Hiya, that Hiya equipped AA with a firearm for

protection, and a number of other factual evidentiary support

1   for the alleged crimes.

2        Israel's request also includes the contents of two

3   cell phone devices from one of the cooperating witnesses.  The

4   contents show photos and video footage, including a group chat,

5   among Hiya, witness AA and other coconspirators the night

6   before and the morning of that murder plot.

7        The evidence also includes surveillance footage,

8   including from near the rival gang leaders residence, which

9   shows that they were surveilling the residence and speaking

10  with Hiya about that surveillance.

11       The evidence includes seized getaway vehicles that

12  were procured at Hiya's direction, and wiretaps that indicate

13  Hiya's leadership over the gang, had leadership over the gang

14  and the assassination attempts.

15       We believe that there is sufficient probable cause,

16  especially under that preliminary hearing type inquiry, that

17  Hiya committed these offenses for which he is wanted.

18       The court's role, again, is not to hold a trial on the

19  merits.  It is simply just to review what Israel has submitted

20  and determine whether that is sufficient to sustain the

21  charges.

22       The only legal point that we want to make, your Honor,

23  that we want to highlight here, I think the rest of it is

24  outlined in our briefing, is that there are substantial

25  limitations on a fugitive's ground for opposing an extradition

1    request.

2            This is partially the reason why we would object to

3    the admission of additional evidence or documents that are not

4    already a part of the case record.

5            A fugitive is not entitled to introduce evidence that

6    contradicts the evidence submitted by the requesting state.

7    Instead, a fugitive's right to dispute the evidence introduced

8    against him is limited to testimony that explains rather than

9    contradicts the demanding country's proof.

10           So we believe that that standard, this explanation of

11   explanatory evidence is limited to clearcut proof that would

12   completely obliterate probable cause.  And "obliterate" is the

13   word used by the Second Circuit, and that case is *Shapiro v.*

14   *Ferrandina*.  The case citation is 478 F.2d 894 (2d. Cir. 1973).

15           THE COURT:  Let me ask you a question of sort of the

16   limits on the proof or evidence that an extraditee can offer.

17   This question about not contradicting, but you can't introduce

18   evidence that would contradict, only evidence that would

19   explain, what if -- because some of the arguments that the

20   extraditee seems to be making are merely pointing out, I'll

21   call it contradictions within, the government within Israel's

22   proof.

23           Is that allowed?  Because it's not then introducing

24   evidence that would contradict.  It is them pointing out

25   contradictions in the evidence that is offered by the country

1  that is seeking him.  So would that be allowed under sort of

2  the precedent about the limited nature of this kind of

3  proceeding?

4  MS. McCANN:  That type of evidence would not be

5  allowed, simply because that type of evidence -- and I think

6  your Honor is referencing maybe evidence that Hiya was not in

7  Israel at certain times or evidence that --

8  THE COURT:  Well, Hiya not being in Israel at certain

9  times I think is them offering evidence.  I understood some of

10  their argument to be -- and maybe I should have waited for them

11  to go first, and then pose the question to you, but I wanted to

12  get your thoughts while were you already standing on your feet.

13  Some of it I took to be contradictions between, for

14  example, what AA says and BB about who was where and when --

15  that's sort of an internal contradiction -- as opposed to

16  information about where Hiya may or may not have been and also

17  the information about the idea that AA may be a paid informant

18  and therefore may be unreliable.  I look at that as -- I will

19  call it external, offering evidence.

20  But what about here's contradictions amongst the

21  evidence that Israel is offering up?

22  Is that allowed?

23  MS. McCANN:  No, your Honor.  I think for the reasons

24  because, one, that would require the Court to weigh evidence

25  and to assess the credibility of certain witnesses, to assess

1  the weight of certain evidence, and because considering that

2  type of evidence in this type of proceeding would expand the

3  scope of this hearing, right?

4            Those questions and whether certain evidence is

5  reliable because certain witnesses have said X and other

6  witnesses have said Y, those are questions for a fact-finder.

7  That is not the scope of this hearing.  That is the scope of

8  the trial that Hiya would be standing for in Israel.

9            So we think this is important because allowing those

10  types of arguments and allowing that type of evidence would,

11  again, widely expand the scope -- inappropriately we think --

12  of this type of hearing.

13            I think any evidence that implicates credibility or

14  factual disputes in connection with the conduct that is alleged

15  substantively with respect to those crimes should not be

16  permitted unless there is evidence that, to use the Second

17  Circuit's words, completely obliterates probable cause.  That

18  evidence does not -- it simply just requires a Court to weigh

19  what they think may be more important versus other evidence.

20            So, your Honor, I think that's the only legal argument

21  we wanted to highlight for your Honor today.

22            Unless your Honor has additional questions, we will

23  rest on the probable cause.

24            THE COURT:  All right.  I don't have more questions at

25  this point, but I may after hearing from Mr. Biale.

1          Thank you.

2          MR. BIALE:  Thank you, your Honor.

3          So this is a weird standard.  We can't introduce

4     evidence that contradicts, but we can introduce evidence that

5     explains or obliterates probable cause.

6          You know, an example, I have to admit I have been kind

7     of scratching my head trying to figure out what that means.  In

8     the *Shapiro* case that the government cited there is an example

9     that I think is helpful, which is the court says the

10    improbability or the vagueness of testimony may destroy the

11    probability of guilt, but the tendering of witnesses who

12    testify to an opposite version of the facts does not.

13         I think that's helpful insofar as, I mean, maybe it

14    doesn't get us so far, but it's helpful insofar as I think it

15    addresses what your Honor was getting at with the question of

16    internal contradictions within the submission, the request, and

17    the supporting papers of the state of Israel.

18         I think to the extent your Honor reads those and

19    develops doubts about the probability of the evidence, that is

20    perfectly fair game, and that's part of -- you know, look, it

21    is in the discretion of the Court to think about what are the

22    indicia of reliability of this hearsay evidence, right?

23         You're being presented with almost entirely hearsay

24    evidence of the statements of cooperating witness AA.  I am

25    going to talk about some of the other material there, but

1    that's primarily the guts of this thing.

2            THE COURT:  But what is your response to the

3    government's argument that clearly, however one were to

4    interpret this obliterate versus explain versus contradictory

5    and what it all means, clearly an extradition hearing, you

6    know, is not meant to be a full trial.

7            The argument that the government made that it would

8    not be appropriate for me to be weighing evidence in the way

9    that you would if you are the trier of fact and making

10   decisions about who's to be believed and who's not to be

11   believed, what's credible and what's not credible, and if we

12   have inconsistent statements from two potential -- well,

13   Israeli witnesses, that it would not be appropriate in this

14   kind of forum for me to say, well, this is reliable here,

15   that's reliable there, particularly in the absence, frankly, of

16   actual live testimony where I could make those kind of

17   credibility judgments.

18           What is your response to that?

19           MR. BIALE:  Look, I think that that is right so far as

20   it goes in that we could not submit to your Honor an affidavit

21   or a declaration or bring in a witness who says, you know, AA

22   said this happened, but I was there and it didn't happen.

23   Right?

24           That would tend to contradict AA's testimony.  But I

25   think much in the same way that your Honor is, you know, when

1    an AUSA or an agent brings you a complaint or a search warrant

2    application, your Honor is called upon to assess whether

3    probable cause is sufficiently set forth in that document, and

4    your Honor can look to the whole document and make

5    determinations about, okay, well, you know, if you say this and

6    you say this, those can't both be true.

7              I am not weighing them and saying which one is right,

8    but one might tend to obliterate the other, right?

9              I think that in exactly the same way that your Honor

10   considers the probable cause showing as a whole in a search

11   warrant application or an arrest warrant application, that's

12   what you should do here.

13             Here there are those kind of internal contradictions

14   in the government of Israel's submission.  So, for example, you

15   know, we talked about in our papers these meetings in late

16   December 2023 and early January 2024 that sort of characterizes

17   the critical planning meetings, and they say that Mr. Hiya was

18   present for them.

19             The government's own documents that we have submitted

20   and are part of the record of this hearing, this is not us

21   bringing Mr. Hiya's testimony, it is not us bringing in, you

22   know, a witness or anything.  These are part of the record that

23   the government has shown that he was not in the country at the

24   time.

25             But you don't even have to look that far.  Because if

OC9NHIYH

you look at those paragraphs, they say that Mr. Hiya was
present at those meetings with a group of people that included
BB, but later in the affidavit of Pnina Levi, which is
submitted as an attachment to the request, it says that BB has
never met Mr. Hiya in person.

So it cannot be that Mr. Hiya was present at those
meetings with BB and that BB has also met Mr. Hiya in person.
At a minimum I think that that tends to obliterate one or the
other of those facts, right?

Maybe the government is right that you can't weigh
those against the other, but I think that it's sort of like in
some ways almost akin to like a *Franks* standard.  If you have
evidence that is contradicted within the application itself, I
think what you should probably do is just disregard that
evidence and then think about is there some residual probable
cause left here.

THE COURT:  Disregard which piece of it?  Or are you
saying both?  If simultaneously the application is asking me to
than collide that Mr. Hiya as present with BB at an in-person
meeting and also that BB has never in fact met him, does that
mean I am to assume that he wasn't there in person or he didn't
meet BB ever or both?

MR. BIALE:  I think we have additional information
here that makes it clear that at least the first part of that
is correct, right?

1      Because we have documents from the government.  We

2  have a whole record here of Mr. Hiya's travels, right?

3      He's going from Indonesia to Malaysia, and there's no

4  record that he entered Israel.  In fact, if he had come to

5  Israel, we all would not be in this courtroom right now because

6  he would be -- you know, the Israelis would have gotten him at

7  that point.  They wouldn't be going through all these hoops to

8  try to extradite him from the United States.

9      I think that it also serves to undermine any purpose

10 that BB serves as corroborating AA's testimony, because they

11 cannot both be true at the same time.

12     Now let me address the issue with respect to AA.

13     We know from evidence that has been, from the

14 cooperation agreement that has been disclosed in court in

15 Israel that AA is a paid informant.

16     Obviously that piece of evidence, your Honor is right,

17 that is external to the record that you have before you.  But

18 it is precisely the kind of information that you would expect

19 and have a right to demand be part of a search warrant

20 application or a complaint.

21     When you are being asked to rely on testimony provided

22 by a cooperating witness or a confidential informant, it is

23 essential to your assessment of probable cause that you know

24 any inducements that person has received, if they're likely to

25 get leniency, if they're paid, the fact --

1              THE COURT:  But doesn't that all go to credibility?

2         Again, we are in this bizarre posture where you cannot

3    contradict, right?  Normally what you would say is here's a

4    witness and they've offered up some evidence and here's all the

5    things that we know about this person for why you should not

6    believe them.

7              Here, it's what is on the face of the petition from

8    Israel.  They have a witness who they say, a cooperating

9    witness who says this happened and that happened and the other

10   things happened.

11             It feels like it's going back into this territory that

12   the government said I cannot go into of weighing and

13   evaluating, right?

14             What you are saying, and you are certainly right, in

15   an application for a warrant here in the United States if there

16   is a confidential source, the government is going to put in

17   their footnote about, you know, whatever, paying them, they

18   have been honest before, or maybe they told a lie or whatever

19   it is.

20             But I don't know that that means, one, that a foreign

21   country is required to produce that information; number two, if

22   they don't, the jurisprudence in this context seems to say that

23   that is exactly the sort of I'll call it sort of external or

24   offering of information by the extraditee which I am not

25   allowed to kind of look into.

1          MR. BIALE:  Well, your Honor, the reason I think

2     that's different is because I don't think that contradicts

3     specific testimony that AA has given.  I think what it serves

4     to do is to undermine your Honor's ability to find that there's

5     sufficient indicia of reliability to AA's testimony to meet a

6     probable cause threshold, right?

7          That's why that information is in search warrant

8     applications and complaints, right?

9          Not because you are supposed to weigh the testimony

10    versus this inducement and come up with some mathematical

11    calculation for whether the testimony is sufficiently reliable

12    that it overcomes the inducement, but it's simply part of what

13    your Honor has to consider to determine whether the probable

14    cause showing has been met.

15         So I think it's a critical fact that, given that it's

16    omitted from the application here, is something that tends to

17    obliterate the -- I don't want to say the credibility, but to

18    the extent that the testimony of AA is a fundamental piece of

19    the probable cause showing that the government is trying to

20    make here, the fact that you have been deprived of this

21    information that is sort of critical to assessing AA as a

22    witness, that obliterates any probable cause showing that is

23    based on his testimony.

24         I understand the Court's -- I mean, I think part of

25    the problem is we're in this confusing territory here, but I

1    would just point the Court back to what the court said in

2    *Shapiro*, which is not that you just accept at face value the

3    testimony of a witness, but that you can look at things like

4    improbability or vagueness, right?  And you can make an

5    assessment about whether there is sufficient indicia of

6    reliability for probable cause.  That's really what this is

7    issue goes to.

8         Very briefly, I just want to address the categories of

9    evidence that the government pointed to besides the statements

10   of the cooperating witnesses, because I think your Honor

11   understands our argument with respect to those.

12        So there's four things the government points to.

13        There's the contents of cell phones.  The issue there

14   is the only contents of the cell phones that are specifically

15   set forth in the application and that Ms. McCann pointed to is

16   a group chat that they say includes Mr. Hiya.  But in fact what

17   it includes is a Turkish phone number that AA has attributed to

18   Mr. Hiya.  Mr. Hiya was not in Turkey at the time.  Again, this

19   issue sort of devolves back to the credibility of AA's tieing

20   that to Mr. Hiya.  That evidence on its face doesn't serve to

21   corroborate AA in any respect with respect to what AA has told

22   the government about Mr. Hiya.

23        The second is surveillance footage.  That footage does

24   not show Mr. Hiya at all.  There's footage from Ben Gurion

25   Airport that shows AA there.  There's other surveillance

OC9NHIYH

1    footage of AA and other individuals tracking Mr. Musli's

2    movements.

3         There's no surveillance footage of Mr. Hiya, save for

4    one thing, which is that they have one shot of a FaceTime

5    conversation that AA is apparently having with Mr. Hiya.  We

6    don't know when that occurred.  We don't know what's being

7    discussed.

8         Obviously all the information that we have about why

9    that is relevant to this crime or this alleged crime comes from

10   AA's testimony.  Perhaps it corroborates that AA in fact knows

11   Mr. Hiya, but I think that's as far as it goes.

12        The seized getaway vehicles, similarly, without AA's

13   statement that Mr. Hiya had some role in procuring them or had

14   any involvement with them whatsoever, they on their own don't

15   tell us anything about Mr. Hiya's involvement.

16        Then finally the wiretap conversations.  I think

17   there's essentially three categories that are discussed in the

18   request.

19        One is a conversation in a Mazda car in which Mr. Hiya

20   is apparently not a participant and there's sort of conclusory

21   allegations similar to what Ms. McCann said, about they show

22   Mr. Hiya was the leader blah, blah, blah, but we don't have any

23   specific evidence about what is said.  I think we can infer

24   that -- well, withdrawn.

25        There is one recorded call with Mr. Hiya in which it

says that the parties wish each other happy new year and they

talk about, among other things, Mr. Musli, but they apparently

do not mention the murder plot that is supposedly being

masterminded by Mr. Hiya at the exact same time.

You know, the request is, it doesn't have any specific

allegations that they are talking about that, but it doesn't

very specific allegations about them talking about other

things.  So that again doesn't put Mr. Hiya into any conspiracy

for attempted murder.

Then finally there's wiretapping and video

surveillance at the home of someone named Shalomi Neambrich.

It doesn't mention Mr. Hiya at all.

If you were to take this and take the sort of *Franks*

example that I talked about, and you really look at what is the

evidence that we have here that doesn't have these problems, we

have one conversation where Mr. Hiya is wishing people happy

new year and mentions the name of the target.  We have one

FaceTime conversation that he has with AA.  That's essentially

it.

I submit, your Honor, that if you were brought an

arrest warrant application that said Mr. Hiya is -- you know,

we want to charge him with conspiracy to commit murder of this

individual and here's what we've got, we've got this one piece

of surveillance footage and we've got this one conversation, I

don't think that would meet the standard of probable cause.

1    I have basically said everything that I had planned to

2  say, so I will say I rest on my papers, but I think I've

3  already gone way beyond that.  So I am going to sit down.

4    MS. McCANN:  Your Honor, I don't have much to add.

5    I think I just want to stress the point that what he

6  is asking this Court to do is again weigh the evidence and

7  consider the substance of the evidence that Israel has

8  submitted to an extent that is inappropriate for this

9  limited-scope hearing.

10    Israel has set forth several types of evidence to

11  support at least five types of crimes.  Your Honor, we believe

12  that that is sufficient.

13    Again, the standard is sufficient to sustain the

14  charge, not sufficient to find Hiya guilty of these crimes.

15  We're simply saying is there enough evidence to support sending

16  Hiya back to Israel to stand trial.  The issue of weighing

17  evidence and whether the evidence that Israel set forth shows

18  Hiya or doesn't show Hiya sufficiently are questions for --

19    THE COURT:  Well, the question of whether the evidence

20  that is in the application from Israel is sufficient to support

21  probable cause is exactly what I am to be determining, but I do

22  take your point that some of the extraditee's argument is

23  premised on this idea that it's not reliable or it's

24  contradictory or I should have had more information about the

25  cooperating individual in terms of whether they are being paid

1  and the like.

2          But I see those as two different things, right?

3          One of them definitely I think unquestionably is

4  something I am to do, which is when there is an application is

5  there enough?

6          Sufficiency is exactly the question.

7          MS. McCANN:  Yes, your Honor.  I think that's right.

8          I think to the extent, though that we are getting into

9  questions of weighing the evidence and weighing witness

10  testimony and applying credibility to certain pieces of

11  evidence over others, I think those are questions that are more

12  appropriate before a trial judge, and that is just not what

13  this Court has been tasked to do.

14          So, your Honor, we believe that what Israel has

15  submitted is sufficient to again sustain the charge that the

16  prosecutors in Israel say that Hiya has committed and to send

17  Hiya back to Israel to then refute the substance of these

18  charges.

19          MR. BIALE:  I am hopefully going --

20          THE COURT:  I addressed this earlier that I don't want

21  anybody tripping and falling in the courtroom.

22          MR. BIALE:  We are almost there.  We're getting

23  through it without injury.

24          I just want to bring to the Court's attention, this is

25  one of the nice things about having very smart lawyers who work

OC9NHIYH

with you.  Mr. Erdelack pointed out to me that a case that we cited in the papers or someone cited in the papers, *Gill v. Imundi*, which is 747 F.Supp. 1028 (S.D.N.Y. 1990).

In that case, I assume it is a district judge reviewing a magistrate's judge's decision on a habeas application, the judge says, "The magistrate does appear to have been mistaken to the extent he expressed on occasion the understanding that the extradition court lacked the authority and discretion to go beyond the face of the government's affidavits for purposes of determining credibility or reliability.  That does not mean that the magistrate is required to do so and the record does not reveal that the magistrate abused his discretionary power in this regard. It is recognized that the credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate."

So that's from the *Gill* decision.  I wanted to bring that to the Court attention because I don't want to be thought of undermining a points of law that we would have in our favor based on my prior remarks.

Thank you.

THE COURT:  Thank you.

Ms. McCann, it is your burden.

Was there anything?

MS. McCANN:  Sorry.  One moment, your Honor.

1          Your Honor, just briefly just to address the *Gill*

2     case, we just want to put on the record that we don't have

3     additional context on that case, but we do believe that it is

4     an isolated opinion.  Our position is that it is an outlier and

5     wrongly decided, so we would disregard that case as just an

6     isolated opinion under that context.

7          Your Honor, I believe that the government rests on

8     probable cause.  We would just like to formally request on

9     behalf of the government of Israel that this court issue a

10    certificate of extraditability.

11         Again, to the extent that the Court would like a

12    proposed order, we are able to provide that for the Court now

13    or we can file it on the docket at a later time.

14         Thank you.

15         THE COURT:  All right.  I don't need that now because

16    I am not prepared to rule right now.  But you can certainly

17    file that on the docket.  To the extent that I do find that he

18    is extraditable, I am sure that the certificate outlines what I

19    need to say in that certificate.

20         I have one issue that I may want some very brief

21    additional briefing on from the parties.  I want to formulate

22    what my question is.  It is just one issue.

23         Beyond that I know we had spoken earlier about the

24    idea that probable cause is the standard for all five of the

25    facto, again, I don't need a lot of bells and whistles on that,

1   if there is a case that you can direct me to now or later, just

2   let me know, and I would be happy to have that.

3         MS. McCANN:  Your Honor, if we may just briefly

4   address that now, we did previously say that we believe that

5   probable cause was the standard for jurisdiction on all five

6   elements.  We went and checked the case law.

7         There isn't any case litigation on the standard for

8   jurisdiction in extradition proceedings because the standard is

9   outlined in the case law as being a factual dispute strictly

10  under Section 3184.  It's whether the person is found in the

11  jurisdiction or not.

12        THE COURT:  All righty.  So then I will not look for

13  some case forthcoming.  That does at least make me feel better,

14  because I couldn't figure out what it was, and I thought I will

15  just ask the parties, and if there is an answer I am sure one

16  of them will know it.  Apparently there is an answer.

17        Beyond that, if there's nothing else, what I expect to

18  do in the next day or two, I am going to want, again, narrowly

19  tailored additional briefing.  I will either file a written

20  order or a text order to that effect.

21        I don't expect to go back over all the ground that we

22  have covered.  There's been extensive briefing already and, as

23  I said, some really helpful arguments, but there is one thing

24  in particular I feel like it could be useful to have some

25  additional information about.  I just want formulate my

OC9NHIYH

1    question on that.

2              Other than that, we will be adjourned.

3              Everyone have a good rest of your day.

4              (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OC9NHIYH

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 1 and 2   . . . . . . . . . . . . . . . . . .11