**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
IN THE MATTER OF THE

EXTRADITION OF ERAN HIYA,

**CERTIFICATION AND**
**ORDER**

**24-MJ-1971 (JW)**

----------------------------------------------------------------X
**JENNIFER E. WILLIS, United States Magistrate Judge:**

In response to a request from Israel, the United States (the "Government") asks that this Court certify that Eran Hiya ("Hiya") is extraditable under "the Convention on Extradition between the Government of the United States of America and the Government of the State of Israel, U.S.-Israel, Dec. 10, 1962, 14 U.S.T. 1707, as amended by the Protocol Between the Government of the United States and the Government of the State of Israel Amending the Convention on Extradition Signed at Washington, D.C. on Dec. 10, 1962 (the "Protocol"), U.S.-Israel, July 6, 2005, S. TREATY DOC. NO. 109-3 (2005)" (collectively, the "U.S.-Israel Extradition Treaty"). Dkt. No. 16 at 1 n.1 ("Gov. Memo").

Hiya opposes extradition on the grounds that: (1) this Court lacks jurisdiction to extradite him because his arrival in this district was in direct violation of the United States' treaty with Malaysia and without the consent of Malaysia; (2) the manner in which the Government obtained custody of him constitutes outrageous government misconduct and is a violation of his due process rights; and (3) the extradition request fails to establish probable cause that he committed the charged crimes. Dkt. No. 20 at 2 ("Hiya Memo"). For the reasons set forth below, this Court certifies that Hiya is extraditable pursuant to the U.S.-Israel Extradition Treaty.

## I.    BACKGROUND

### A. Hiya's arrival in the Southern District of New York

Critical to Hiya's challenges against extradition, the Parties recount two very distinct series of events that led to Hiya being found in the Southern District of New York.  In fairness, this Court summarizes each of the Parties' descriptions of those events below, but does not rely on any attempts by Hiya to present facts in contradiction of probable cause. See Messina v. United States, 728 F.2d 77, 80 (2d Cir. 1984) ("In the exercise of the extraditing judge's discretion, a fugitive may be permitted to offer explanatory testimony, but may not offer proof which contradicts that of the demanding country.").

### i.    The Government's Description of Events Between Hiya's Arrival in Malaysia and his Removal from Malaysia to the SDNY

The Government presents two sentences related to Hiya's arrival in Malaysia and his later removal to the Southern District of New York.  "On May 13, 2024 (local time in Kuala Lumpur, Malaysia), Malaysian authorities transferred custody of Hiya to the Federal Bureau of Investigation ("FBI"), who executed the arrest warrant. On May 14, 2024, FBI agents brought Hiya to the courthouse in this District for presentment and arraignment." Gov. Memo at 8.

### ii.    Hiya's Description of Events Between his Arrival in Malaysia and Removal from Malaysia to the SDNY

Hiya alleges that Israel and the Government began a joint investigation of him in 2020.  Hiya Memo at 3.  Hiya also alleges that on November 27, 2023, the Israeli National Police ("INP") informed the FBI that Hiya "left Turkey for Malaysia on

October[]25, 2023" and that there had been an attempt to assassinate him in Malaysia on November 19, 2023.  Id.  He then alleges that the next day, FBI Assistant Legal Attaché to Tel Aviv, Jason T. Dodd, emailed FBI Special Agents an update that "Hiya Moved to Malaysia."  Id.

Hiya further alleges that on December 7, 2023, the FBI made a Request for Information to Europol based on the belief that Hiya was leading an "Israeli Based Organization Crime Syndicate" with a "global reach" operating out of countries including "Israel, Turkey, United Kingdom, UAE, South Africa, Morocco, Malaysia, Ukraine, Australia, Germany, Qatar, United States, Mexico, Canada, and other possible unknown countries."  Hiya Memo at 4.  Hiya alleges that the Request for information also included that he held passports from the United States, Israel, and Morocco.  Id.  However, Hiya then states that the FBI made a similar request to Malaysia, but "scrubbed" his ties to Israel.  Id.  More specifically, Hiya alleges that the FBI used the same description of "global reach" but omitted Israel from the list and excluded his Israeli passport when providing passport and visa information.  Id. at 4–5.

Hiya then alleges, based on a document titled "Examination and Compilation of Travel Records and Border Crossings of Eran Hiya," that on March 12, 2024, "the FBI analyzed previously received records to evaluate representations [he] made in his March 2023 U.S. passport application for his two minor children."  Hiya Memo at 8 (citing Dkt. No. 20-17).

Hiya alleges that on April 4, 2024, he was arrested by Malaysian police and informed that it was for his own protection because someone had come to Malaysia to assassinate him.  Hiya Memo at 9.  Hiya alleges that he was then held for approximately fourteen days, during which he was unable to speak to an attorney. Id.  In addition, Hiya avers he was blindfolded during two Malaysian court appearances—both conducted in Malay without translation.  Id.  While Hiya does not have access to conclusive documentation, he believes the limited discovery he does have "suggests that Malaysia may have detained Mr. Hiya at the behest of the United States." Id. at 8–9.

Hiya, upon information and belief, alleges that "around the same date that [he] was detained in Malaysia, April 4, 2024, Judge Avital Amsalem Gilboa of the Tel Aviv Magistrates Court issued a warrant for [his] arrest, based on charges of attempted murder and other related crimes."  Hiya Memo at 9.  On April 11, 2024, the Government filed a criminal complaint in this District, charging Hiya with passport fraud and unlawful application for and attempted procurement of U.S. citizenship, and obtained an arrest warrant based on that complaint.  Id.; Dkt. No. 20-20.

According to Hiya, on April 18, 2024, he was released from Malaysian custody, and after meeting with his attorney for less than an hour, he was re-arrested.  Hiya Memo at 10.  Hiya alleges that he was told the re-arrest was "in connection with investigations under the Security Offences (Special Measures) Act 2012 ['SOSMA 12'] in relation to the offen[s]e of organi[z]ed crime under Section 130V of the Penal Code." Id.  Hiya alleges based on an FBI document that he was being held in Malaysia on a

"28-day remand" where "his cell was separated by at least two or three cells from other people so that he could not communicate with anyone." Dkt. No. 20-22. The FBI document also states that a member of the Royal Malaysian Police "suggested that the FBI pick up HIYA the first week of May 2024, but the FBI should coordinate with the Inspector General of Police (IGP) Secretariat's office." Id.

Hiya alleges that on May 5, 2024, the Royal Malaysian Police informed him that he would be "deported" to Poland and instructed him to purchase a flight to Poland for May 10, 2024. Hiya Memo at 11. On May 6, 2024, the Government filed a sealed indictment against Hiya on charges of unlawful application for and attempt to procure United States citizenship, and conspiracy. Id.; United States v. Eran Hiya, No. 1:24-cr-282 (VM) Dkt. No. 2. On the same day, the Government obtained a second arrest warrant for Hiya. Hiya Memo at 11; Dkt. No. 20-24; United States v. Eran Hiya, No. 1:24-cr-282 (VM) Dkt. No. 4.

On May 10, 2024, a second Israeli arrest warrant for Hiya was issued. Hiya Memo at 11; Dkt. No. 1 at 12–13. According to Hiya, also on May 10, 2024, he "was told his flight to Poland would not take place." Hiya Memo at 11. Hiya goes on to allege that "[w]hen [he] asked Malaysian police why he was not being sent to Poland, an officer told him that he was meant not to tell him, but Americans would be coming between the evening of May 12 to the morning of May 13, 2024 to take him to the United States." Id.

Based on documents produced in this matter, Hiya initially alleged that on April 15, 2024, the FBI Office of the Legal Attaché sent the Royal Malaysia Police

Inspector General a letter requesting Hiya's deportation.  Hiya Memo at 9; Dkt. No. 20-18.  However, in a subsequent letter to this Court, Hiya provided an exhibit containing an email thread between FBI agents dated May 11, 2024.  Dkt. No. 35.[1] The FBI email thread reveals that on May 11, 2024, FBI agents suggested that the letter requesting Hiya's deportation be back dated to April 15, 2024, rather than May 11, 2025.  Id.  Hiya then alleges that neither his deportation request or other documents he is aware of disclosed to Malaysia that he was wanted in Israel or that the United States intended to extradite him to Israel.  Hiya Memo at 9.

According to Hiya, on May 12, 2024, his counsel filed a "Notice of Motion to obtain a Writ of Habeas Corpus for the Malaysian Authorities to produce Hiya before the Malaysian court."  Hiya Memo at 12.  Hiya alleges that in response, the Malaysian Immigration Department objected "arguing that 'KETUA PENGARAH IMIGRESEN MALAYSIA' should not be a party in the case because it has never 'caught [Mr. Hiya] under section 35 Immigration Act 1959/63 . . . has never produced an Expulsion Order and a Remand Order towards [Mr. Hiya], [and] . . . [b]ased on [its] records, [Mr. Hiya] has exited Malaysia on 13.5.2024.'"  Hiya Memo at 12; Dkt. No. 20-26.

---

[1] A redacted version of this letter appears on the docket and does not contain the referenced attachment.  See Dkt. No. 35.  An unredacted version, along with attachments titled A and B, were emailed to this Court on January 16, 2025.  While the Government filed a reply stating, amongst other things, that it "does not know why the RMP wanted the formal written request to be backdated," the letter did not object to the documents being considered in this matter.  Dkt. No. 36.  This Court admits those documents into evidence to the extent they may be used to support Hiya's due process arguments but will not consider them for probable cause.

According to Hiya, the following events then directly led to his arrival in the Southern District of New York:

> [I]n the early hours of May 13, 2024, Malaysian police brought Mr. Hiya blindfolded and with his ears covered to the airport in Kuala Lampur and ushered him into a bathroom. Inside the bathroom, American law enforcement agents, including Special Agent Lewis, were waiting for him. Both on the way to the airport and inside the bathroom, Mr. Hiya repeated his objections to being forcibly taken to the United States. He was ignored. Instead, US agents administered medical tests, strip searched him, placed him into handcuffs, and again covered his eyes and ears, so he could neither see nor hear anything. On the airplane, the agents applied leg restraints, but removed Mr. Hiya's mask and headphones so they could ask about his "enemies" in Israel. Mr. Hiya asked whether Special Agent Lewis was working for the Israelis, and she denied that she was. Special Agent Lewis did not, however, ask him any questions conceivably related to the passport case, and instead asked him questions solely about the charges in Israel.

Hiya Memo at 12–13 (internal citations to exhibits omitted).

**B. Procedural History**

On May 17, 2024, the Government filed a complaint in this matter seeking an arrest warrant for Hiya in accordance with the U.S.-Israel Extradition Treaty. Dkt. No. 1. That same day, an arrest warrant was issued as to Hiya. Dkt. No. 2. Hiya was arrested on May 20, 2024, at approximately 11:00 AM. Dkt. No. 5 at 2. Also on May 20, 2024, this Court held an initial presentment where Hiya did not waive his right to an extradition hearing but consented to detention while reserving the right to make a future bail application. Id. at 10.

On July 19, 2024, the Government filed a letter submitting Israel's request for Hiya's extradition attached as a 245-page exhibit. Dkt. No. 13; Dkt. No. 13-1. On that same day, this Court held a hearing where a briefing schedule was set for Hiya's

opposition to extradition.  Dkt. No. 14.  On September 23, 2024, the Government filed a brief in support of Hiya extradition.  Gov. Memo.  On October 29, 2024, Hiya filed a brief in opposition of extradition.  Hiya Memo.  On November 13, 2024, the Government filed a reply brief.  Dkt. No. 26 ("Gov. Reply").

On December 9, 2024, this Court held an evidentiary hearing pursuant to 18 U.S.C. § 3184.  Dkt. No. 30.  At the evidentiary hearing, this Court heard oral argument on the Parties' briefs and admitted into evidence the Government's 245 pages of exhibits attached to Dkt. No. 13.  Dkt. No. 30 at 10–11.  This Court also admitted into evidence the 185 pages attached to Hiya's brief and the affidavit of Hiya's Malaysian counsel at Dkt. No. 28.  Id. at 34–36.  While the government only objected to the affidavit of Malaysian counsel, in overruling that objection this Court noted that it would not rely on any evidence presented to contradict probable cause for Hiya's extradition.  Id. at 35–36.

On December 13, 2024, this Court ordered the Parties to provide additional briefing on relevant caselaw on whether pre-textual motivations were of consequence in this matter.  Dkt. No. 29.  On December 23, 2024, both Parties filed separate letter briefs in accordance with the December 13th Order.  Dkt. Nos. 32–33.

On January 3, 2025, Hiya filed a letter brief requesting that this Court hold its extradition decision in abeyance pending forthcoming supplemental evidence.  Dkt. No. 34.  On January 17, Hiya filed and emailed a letter request that this Court "admit into the record and consider" two additional exhibits.  Dkt. No. 35.  On February 23, 2024, the Government replied to "correct [Hiya's] misrepresentations" but did not

object to Hiya's request.  Dkt. No. 36.  On February 24, 2024, Hiya filed a reply letter.
Dkt. No 37.

### C. The Allegations Against Hiya

Israel seeks the extradition of Hiya to face charges in connection with an alleged attempt to murder a rival gang member.  Dkt. No. 1; Dkt. No. 13; Gov. Memo at 2–8.

i.    <u>The Charges against Hiya</u>

Hiya is wanted by Israel on: (1) two counts of attempted murder, in violation of Section 305(1) of Israel's Penal Law; (2) one count of conspiracy to commit a felony, in violation of Section 499(a)(1) of Israel's Penal Law; (3) one count of carrying and transporting a weapon, in violation of Sections 144(a) and (b) of Israel's Penal Law; (4) one count of changing the identity of a vehicle part, in violation of Section 413I of Israel's Penal Law; and (5) one count of destroying evidence, in violation of Section 242 of Israel's Penal Law.

ii.    <u>The Alleged Attempted Murder and Conspiracy</u>

The following allegations are summarized from the Government's brief which largely relies on Israel's written request for extradition.  The Israeli Police conducted an undercover investigation into the alleged ongoing conflict between the Hiya Gang and Musli Gang.  Gov Memo at 3.  The investigation included the "monitoring and detection of Hiya Gang members and activities from December 2023 to February 2024."  <u>Id.</u>

On or around December 31, 2023, Israeli informant "A.A." allegedly met with Ofek Harush ("Harush") at the direction of Hiya to plan the assassination of Musli. Gov. Memo at 3, 5. Allegedly, Harush and co-conspirator B.B., now a cooperating witness, were supposed to "transport a device containing 4 kilograms of explosives to Bograshov Street in Tel Aviv." Id. at 5. The Government then alleges that Harush was to drive the explosive device to Musli's hotel, and after A.A. cut off Musli's vehicle, Harush was to throw the explosive under Musli's vehicle and detonate it after driving off. Id. That evening, A.A., B.B., Haursh, and another individual allegedly carried out "several simulations of the murder plan." Id. at 6.

On January 4, 2024, A.A. allegedly informed Hiya that they were prepared to carry out the assassination and that it would be executed on January 7, 2024. Gov. Memo at 6. Leading up to and on January 7, 2024, A.A., B.B., Haursh, and another individual allegedly took several steps to prepare for the assassination, including meeting with Hiya and receiving necessary materials. Id. However, on January 8, 2024, Harush and B.B. allegedly "could not locate the motorcycle that Hatuel placed, so they postponed the attack." Id.

In the interim, several co-conspirators allegedly "searched for a place near the city of Ramle where they could burn the vehicles and A.A. and Hiya would destroy the evidence after the eventual attack." Gov. Memo at 6.

The Government alleges that "[o]n January 14, 2024, Hiya informed A.A. that Musli would be returning to Israel from a trip abroad, and Hiya asked A.A. to surveil Musli…." Gov. Memo at 7. The Government then alleges that "[a] group chat

including Hiya's Turkish phone number, along with the number of Harush, contained directions from Hiya to A.A. to continue surveillance and informed the men that the attempt would occur at 9:00 AM on January 16, 2024." Id. The group chat also allegedly contained messages where "A.A. informed Hiya and Harush of Musli's expected departure, in order to direct Harush to the area where he would throw the explosive device" and "[a]t 9:00 AM, A.A. reported to the group that he was waiting for Musli to leave the hotel." Id.

"On January 16, 2024, Israeli law enforcement arrested the co-conspirators minutes before they were set to execute their plan to murder Musli." Gov. Memo at 7. The Government alleges that "[a]t the time, all of the getaway vehicles and scooters were waiting at points agreed upon in advance and the explosive device had been prepared." Id. After the arrest of A.A. and Harush, other co-conspirators allegedly "destroyed prepaid mobile phones used to coordinate the attempted attack." Id.

The Government further alleges that while "Hiya was not arrested in connection with this attempted attack," as head of the Hiya Gang, he "was involved in every stage of the plan to assassinate Musli." Gov. Memo at 4, 7. To support that argument the Government alleges, amongst other things, that Hiya "conceived of the plan, initiated it, provided finances, and instructed his men to carry out the murder." Id. at 4.

The Government also alleges that "[f]rom January 2022 to January 2024, Hiya equipped the Hiya Gang with pistols, hand grenades, explosive devices, vehicles, and

11

other offensive equipment, as well as the means to cover their crimes from authorities, all in order to commit a spate of offenses against the Musli Gang."

## II.    LEGAL STANDARD

"In the United States, extradition is governed by the federal extradition statute." Matter of Rory McGrath, No. 21-MJ-5058 (PED), 2021 WL 5983127, at *2 (S.D.N.Y. Dec. 15, 2021) (citing Cheung v. United States, 213 F.3d 82, 87 (2d Cir. 2000); see also Matter of Extradition of Hyuk Kee Yoo, No. 20-MJ-2252 (JCM), 2021 WL 2784836, at *4–5 (S.D.N.Y. July 2, 2021) (same); In re Extradition of Khochinsky, (JSR), 116 F. Supp. 3d 412, 419 (S.D.N.Y. 2015) (same). Pursuant to 18 U.S.C. § 3184, the federal extradition statute, a magistrate judge may issue a warrant for the arrest of someone found in her jurisdiction, and whose extradition is sought, so that the person charged may be brought before the Court "to the end that the evidence of criminality may be heard and considered." 18 U.S.C. § 3184. "If, on such hearing, a magistrate judge 'deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention,' the magistrate judge 'shall certify the same' to the Secretary of State. Matter of Rory McGrath, 2021 WL 5983127, at *2 (quoting 18 U.S.C. § 3184).

"The judicial officer's inquiry is confined to the following: whether a valid treaty exists; whether the crime charged is covered by the relevant treaty; and whether the evidence marshaled in support of the complaint for extradition is sufficient under the applicable standard of proof." Matter of Rory McGrath, 2021 WL 5983127, at *2 (quoting Cheung, 213 F.3d at 88) (internal quotation marks omitted).

12

Extradition hearings are not the occasion for an adjudication of guilt or innocence, but rather "a preliminary examination to determine whether a case is made out which will justify the holding of the accused and his surrender to the demanding nation." Matter of Extradition of Hyuk Kee Yoo, 2021 WL 2784836, at *4–5 (citing Melia v. United States, 667 F.2d 300, 302 (2d Cir. 1981) and Lo Duca v. United States, 93 F.3d 1100, 1104 (2d Cir. 1996)). "The judicial officer thus performs an assignment in line with his or her accustomed task of determining if there is probable cause to hold a defendant to answer for the commission of an offense." Id. (cleaned up) (citing Lo Duca, 93 F.3d at 1104).

"Neither the Federal Rules of Evidence nor the Federal Rules of Criminal Procedure are applicable in extradition proceedings." Matter of Rory McGrath, 2021 WL 5983127, at *2 (citing Fed. R. Crim. P. 1(a)(5)(A); Fed. R. Evid. 1101(d)(3)). Instead, admissibility is governed by 18 U.S.C. § 3190, which provides:

> Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.

"Accordingly, hearsay evidence is admissible." In re Extradition of Khochinsky, 116 F. Supp. 3d at 419 (citing Melia, 667 F.2d at 302). "A defendant has no right to cross-examine witnesses or introduce evidence to rebut that of the prosecutor." Messina v. United States, 728 F.2d 77, 80 (2d Cir. 1984). However, within "the extraditing

judge's discretion, a[n] [extraditee] may be permitted to offer explanatory testimony, but may not offer proof which contradicts that of the demanding country." Id.

## III.    DISCUSSION

Hiya does not contest whether: this Court was authorized to conduct the extradition hearing; a valid extradition treaty exists between the United States and Israel; or the crime charged is covered by the relevant extradition treaty. Thus, the only remining issues are whether this Court has jurisdiction over Hiya and whether probable cause exists that Hiya committed the charged crimes. This Court addresses each in turn.

### A. Jurisdiction over Hiya

Hiya makes two distinct arguments that this Court lacks jurisdiction over him. First, Hiya argues that the circumstances surrounding his arrest and removal to the United States violated the extradition treaty between the United States and Malaysia. Hiya Memo at 16–20. Second, Hiya argues that the Government's conduct violated his due process rights. Id. at 20–24.

i.    U.S.-Malaysia Extradition Treaty

Hiya clarifies that he does not invoke a violation of the U.S.-Malaysia Extradition Treaty under the rule of specialty. Hiya Memo at 18 n.5. Instead, Hiya argues that his "abduction" violates the U.S.-Malaysia Extradition Treaty because his "abduction" occurred "for the secret purpose of producing the individual to a country with whom Malaysia does not have an extradition treaty." Id. at 17. Hiya argues that under Alvarez-Machain, courts may look to see if an extradition treaty

14

explicitly prohibits the abduction of an individual, and, if so, may find that jurisdiction does not exist. See id. at 16–17 (citing United States v. Alvarez-Machain, 504 U.S. 655, 668–69 (1992). In support of his argument, Hiya argues that Malaysia's objection to his "abduction" can be inferred from a 1992 statement from the then Prime Minister of Malaysia and from the Government's "extensive efforts to conceal" its intention to extradite him to Israel. Id. at 18–20.

The Government argues, first that under 18 U.S.C. § 3184, this Court has jurisdiction over Hiya because he was "arrested" in this District. Gov. Memo at 12. And second, that the U.S.-Malaysia Extradition Treaty does not apply to Hiya because he was "deported" from Malaysia to the United States—not extradited. Gov. Reply at 4–8. Lastly, the Government argues that even if the U.S.-Malaysia Extradition Treaty applied, Hiya lacks standing to assert a violation in the absence of language that provides the right of private enforcement. Id. at 8–10.

There is a fatal flaw in Hiya's arguments to this Court regarding the alleged violation of the U.S.-Malaysia Extradition Treaty: he fails to establish his standing to assert a violation. In Alvarez-Machain, which he relies on for his ultimate argument, the District Court, Ninth Circuit, and Supreme Court all noted that Mexico directly protested the abduction of Dr. Machain—allowing Dr. Machain to assert an alleged violation of that extradition treaty. United States v. Caro-Quintero, (ER), 745 F. Supp. 599, 608 (C.D. Cal. 1990) ("The Embassy of Mexico has presented a diplomatic note to the United States Department of State in Washington, D.C. concluding that U.S. agents violated the terms of the extradition treaty….") United

States v. Alvarez-Machain, 946 F.2d 1466, 1467 (9th Cir. 1991) ("…the Mexican government has made several specific formal diplomatic protests to the United States government.")  Alvarez-Machain, 504 U.S. at 669 ("Mexico has protested the abduction of respondent through diplomatic notes….").  In no way did those Courts imply that a sufficient objection or protest could be inferred either from a decades old statement from that country's former leader or from the actions of the United States.

In fact, the Second Circuit requires that an extraditee prove that the government on the other side of the treaty "register[] an official protest with the United States Department of State" or some other official objection.  See U. S. ex rel. Lujan v. Gengler, 510 F.2d 62, 67 n.8 (2d Cir. 1975).; see also United States v. Barinas, 865 F.3d 99, 105 (2d Cir. 2017) ("absent protest or objection by the offended sovereign, a defendant has no standing to raise the violation of international law") (citing United States v. Garavito-Garcia, 827 F.3d 242, 246 (2d Cir. 2016), United States v. Suarez, 791 F.3d 363, 367–68 (2d Cir. 2015), and United States v. Reed, 639 F.2d 896, 902 (2d Cir. 1981).  Hiya has made no showing that Malaysia officially protested or objected to his alleged abduction.  Moreover, the only Malaysian statement Hiya does reference is that it believed its immigration department should not be a party to his request for a writ of habeas corpus.  Hiya Memo at 12; Dkt. No. 20-26.

Hiya's argument that Barinas is "inapposite" because it dealt with the rule of specialty is also unavailing.  While the rule of specialty was at issue in Barinas, the

requirement that an extraditee prove an official objection or protest was not limited to that issue.  See Lujan, 510 F.2d at 67.

Given Hiya's lack of standing to assert a violation of the U.S.-Malaysia Extradition Treaty based on his failure to show Malaysia's objection, this Court need not evaluate his remaining argument that his "abduction" could be an inferred violation of that treaty.

ii.    Due Process

Hiya asserts that this Court should also refuse to certify him as extraditable because the Government's conduct that resulted in his presence in this District violated his due process rights.  Hiya Memo at 20–24.  Hiya argues that the Government allegedly made "misrepresentations" and "material omissions" to mislead Malaysia, and "reverse engineer[ed] a timeline" to present to this Court regarding Israeli arrest warrants.  Id. at 20.  Hiya also asserts that the Government "concocted the passport fraud case—a miniscule charge relative to other federal charges for which individuals are extradited in this district—as a pretext for securing [his] presence in the jurisdiction."  Id.  In total, Hiya contends that "the government's conduct was shocking and outrageous."  Id.

Hiya argues that the line of cases applying the Ker-Frisbie doctrine is inapplicable here because they "all involve extradition *into* the United States to face charges here, as opposed to the question whether someone forcibly abducted is properly "found in" the district for purposes of extradition *out*."  Hiya Memo at 21. Instead, Hiya argues this Court should follow Matter of Extradition of Atta, No. 87-

0551-M (JLC), 1988 WL 66866, at *20 (E.D.N.Y. June 17, 1988) ("Atta I"). <u>Id.</u> at 22–24.

To start, the Government maintains that Hiya's allegations surrounding any due process violations are "without any foundation" and should not be taken as true. Gov. Reply at 10. However, the Government argues that even if Hiya's allegations are accepted as true, the <u>Ker-Frisbie</u> doctrine should apply—making "shocking governmental conduct" such as that found in <u>Toscanino</u> the threshold for a due process violation that would warrant denial of certification of extradition. <u>Id.</u> at 11–12.

Then, contradicting its previous argument that <u>Toscanino</u> is the applicable standard, the Government asserts that "[e]xtending <u>Toscanino</u> to extradition proceedings would be futile because 'requir[ing] the extradition magistrate to divest himself of jurisdiction [over extradition proceedings] would not serve to deter illegal conduct on the part of United States' officials since the fruit of that alleged conduct…would be unaffected.'" <u>Id.</u> at 14–15 (quoting <u>David v. Att'y Gen. of U.S.</u>, 699 F.2d 411, 414 (7th Cir. 1983)). The Government argues that unlike <u>Toscanino</u> where the Court declining to exercise jurisdiction deprived the Government of the fruits of its own illegal conduct, a similar finding here "would only serve to deprive the Government of Israel, and Hiya has not alleged any illegal conduct by the Government of Israel in this jurisdiction." <u>Id.</u>

The Government also argues that Hiya's alleged due process violation is improperly raised in an extradition proceeding.[2]  Gov. Reply at 14.  The Government argues that this is not the proper forum to make a due process violation argument because "[a]ny purported due process violation in how he arrived in the United States does not negate the fact that Hiya was found in this jurisdiction in accordance with § 3184."  Id.

This Court finds the Government's argument—that raising a due process violation in an extradition proceeding is improper so long as you are "found" in the Court's jurisdiction—deeply concerning.  While, as discussed below, this Court believes the threshold to establish a due process violation that would be sufficient to invalidate jurisdiction is extremely high, such recourse must theoretically exist.  Anything else would result in Courts ignoring even the most heinous government conduct— including that found in Toscanino—as long as the United States is not the one benefiting from that conduct.  The Government's notion that this Court would even consider endorsing such carte blanche is inconceivable.  And this Court declines to do so.

As both Parties note, few cases discuss the applicability of a due process violation by way of "abduction" in extradition proceedings.  Hiya Memo at 21–22; Dkt. No. 30 at 17–18.  Instead, this specific issue is typically raised in criminal

---

[2] Similarly, the Government argues that this Court is not to be concerned with Hiya's allegations involving Malaysia's law enforcement because "opining on the legality of Malaysian law enforcement actions is outside the scope of this Court's limited function in an extradition proceeding."  Gov. Reply at 15–16.

prosecutions.  Dkt. No. 30 at 17–18.  In light of this scarcity, the Court looks to the Ker-Frisbie doctrine, Toscanino, and other caselaw for guidance on how to navigate this matter.

"As a general principle, the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a forcible abduction."  United States v. Abdalla, (VM), 317 F. Supp. 3d 786, 791 (S.D.N.Y. 2018) (internal quotation marks omitted) (citing Frisbie v. Collins, 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541 (1952) and Ker v. Illinois, 119 U.S. 436, 444, 7 S.Ct. 225, 30 L.Ed. 421 (1886)).  "This so-called 'Ker-Frisbie doctrine,' 'rest[s] on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly appri[s]ed of the charges against him and after a fair trial in accordance with constitutional procedural safeguards.'"  Id.  (quoting Frisbie, 342 U.S. at 522.).

An often-recognized[3] exception to the Ker-Frisbie doctrine exists under Toscanino when a defendant alleges a "complex of shocking governmental conduct sufficient to convert an abduction which is simply illegal into one which sinks to a violation of due process."  United States v. Herbert, (SHS), 313 F. Supp. 2d 324, 331 (S.D.N.Y. 2004) (quoting U.S. ex rel. Lujan v. Gengler, 510 F.2d 62, 66 (2d Cir.1975)).

---

[3] This Court notes that some Courts in this District have questioned the authority of Toscanino or declined to follow it. United States v. Yousef, No. S3 08-CR-1213 (JFK), 2011 WL 2899244, at *7 (S.D.N.Y. June 30, 2011); United States v. Umeh, (JSR), 762 F. Supp. 2d 658, 663 (S.D.N.Y. 2011), aff'd, 527 F. App'x 57 (2d Cir. 2013); United States v. Ghailani, 751 F. Supp. 2d 502, 507 (S.D.N.Y. 2010).

In <u>Toscanino</u>, the defendant alleged that he and his pregnant wife were lured to a deserted area where he was knocked unconscious with a gun by paid agents of the United States and abducted.  <u>United States v. Toscanino</u>, 500 F.2d 267, 269 (2d Cir. 1974).  Toscanino was later taken to Brasilia where he was tortured for seventeen days, including being denied sleep, fed just enough to keep him alive, beaten, forced to walk for hours, pinched with metal pliers, alcohol flushed into his eyes, nose, and anal passage, and electrocuted.  <u>Id.</u>  Toscanino was then drugged and flown to New York where he was later arrested.  <u>Id.</u>  The Second Circuit "held that Toscanino had alleged a violation of due process which, if proved, would require the district court to divest itself of jurisdiction over him."  <u>U. S. ex rel. Lujan v. Gengler</u>, 510 F.2d 62, 64 (2d Cir. 1975) (summarizing their ruling in Toscanino).

The very next year, in <u>U. S. ex rel. Lujan v. Gengler</u>, the Second Circuit compared the allegations of Toscanino to those of Lujan.  <u>Lujan</u>, 510 F.2d at 66.  Lujan alleged that he was lured to Bolivia by a paid agent of the United States.  <u>Id.</u> at 63. Once in Bolivia, Lujan was taken into custody by Bolivian police acting as paid agents of the United States, never formally charged with a crime, and was not allowed to contact anyone.  <u>Id.</u>  Lujan was then placed on a plane to New York where he was arrested by United States agents.  <u>Id.</u>  The Second Circuit held that when compared to <u>Toscanino</u>, Lujan's allegation lacked a "complex of shocking governmental conduct sufficient to convert an abduction which is simply illegal into one which sinks to a violation of due process."  <u>Id.</u> at 66.

Several years later the Second Circuit revisited this issue in <u>United States v.</u> <u>Reed</u>. <u>See generally</u> F.2d 896 (2d Cir.1981). In <u>Reed</u>, the Circuit held that Reed's allegations that he was enticed onto a plane and held a gunpoint by U.S. agents transporting him from the Bahamas to Florida were closer to that of <u>Lujan</u> than <u>Toscanino</u>. <u>Id.</u> at 901–02. Consequently, the Circuit held that "the alleged circumstances of Reed's arrest do not sink to the level of a violation of due process." <u>Id.</u> at 902.

The prior precedent involved criminal proceedings, Atta I, in the Eastern District of New York is a rare extradition case involving an alleged due process violation. <u>See generally</u> <u>Atta I</u>, 1988 WL 66866. The court in <u>Atta I</u> held that even if it did not find political offense exception protected Atta, it would be unable to certify Atta for extradition on jurisdictional grounds given that court's conclusion that he was unlawfully brought into the United States. <u>Id.</u> at *18.

The Court in <u>Atta II</u> conducted a *de novo* hearing on certification of extradition.[4] <u>Matter of Extradition of Atta</u>, (ERK), 706 F. Supp. 1032, 1036 (E.D.N.Y. 1989) ("Atta II"). <u>Atta II</u> held that the Judge in <u>Atta I</u>, relied on an incorrect presumption, combined with insufficient evidence, "to support a finding that the United States asked Venezuela to arrest the defendant and deport him to the United States so that he could be extradited to Israel." <u>Id.</u> <u>Atta II</u> clarified in the subsequent

---

[4] A *de novo* review was conducted because the Government's only choice was to file a new complaint. <u>Ahmad v. Wigen</u>, 910 F.2d 1063, 1065 (2d Cir. 1990) ("An extraditee's sole remedy from an adverse decision is to seek a writ of habeas corpus; the Government's sole remedy is to file a new complaint.")

extradition proceeding the government presented new "credible and compelling evidence establishing that it did not instigate the defendant's arrest, that it was not responsible for the conditions of his confinement and that it did everything possible to encourage Venezuela to deport him to Israel rather than the United States." Id. at 1036–37.

Atta II also held that even on the record before the Court in Atta I, that Court's decision to divest itself of jurisdiction was erroneous. Atta II, 706 F. Supp. at 1037. Atta II concluded that while Atta I considered guiding caselaw such as the Ker-Frisbie doctrine, it failed to explain how the conduct that led to Atta being found in their jurisdiction amounted to a due process violation that "shocks the conscious" under Rochin and Lujan. Id. (citing Rochin v. California, 342 U.S. 165, 166, 72 S. Ct. 205, 206, 96 L. Ed. 183 (1952) and Lujan, 510 F.2d at 62). And that no basis for that conclusion could be made. Id.

Atta went on to appeal the Atta II decision by way of a petition for writ of habeas corpus in Wigen. Ahmad v. Wigen, (JBW), 726 F. Supp. 389, 394 (E.D.N.Y. 1989), aff'd, 910 F.2d 1063 (2d Cir. 1990). The Court in Wigen concluded that Atta's allegations did not amount to a due process violation that would require that Court to divest itself of jurisdiction under Toscanino and Lujan. Id. at 398.

Atta then appealed that ruling to the Second Circuit which affirmed the dismissal of Atta's petition for a writ of habeas corpus. Ahmad v. Wigen, 910 F.2d 1063, (2d Cir. 1990). The Circuit held that Atta "was deported by Venezuela to the United States in a proper manner, that he was not forcibly abducted, and that he was

'found' within the territory of the United States within the meaning of the United States extradition treaty with Israel." Id. at 1065.  The Circuit also held that "the Government's conduct violated neither the Constitution nor established principles of international law." Id. at 1065–66 (citing United States v. Reed, 639 F.2d 896, 901–02 (2d Cir.1981) and Lujan, 510 F.2d at 65–68).

While the Circuit in Wigen did not explicitly elaborate on the standard needed to show a due process violation sufficient for a court to divest themselves of jurisdiction in an extradition proceeding, their reliance on Reed and Lujan implies that the standard is the extremely high one set forth in Toscanino.  See Wigen, 910 F.2d at 1065–66.  Here, even if this Court accepted as true Hiya's allegations that he was arrested in Malaysia at the behest of the Government, isolated from others, that the Government backdated documents, the Government omitted information, the Government concocted a passport fraud case, and then the Government kidnaped him, it would still pale in comparison to Toscanino.  The Circuit has repeated that absent "cruel, inhuman and outrageous treatment," "terror," or "torture" there is no justification for a court to divest itself of jurisdiction on due process grounds.  See Reed, 639 F.2d at 901–02; Lujan, 510 F.2d at 65–68 (2d Cir. 1975).

Accordingly, this Court has no choice but to rule that Hiya has not alleged, let alone proven, that the conduct leading to him being "found" in this Court's jurisdiction is sufficient for this Court to divest itself of jurisdiction in this matter. See Wigen, 910 F.2d at 1065–66; Reed, 639 F.2d 896, 901–02; Lujan, 510 F.2d at 65–68; Toscanino, 500 F.2d at 275.

This Court's hands are tied by <u>Toscanino</u> and its progeny which draws the due process line at literal torture. However, it must be stated that this Court is deeply troubled by the apparent actions of the Government in this matter and that this ruling is in no way meant to inadvertently "convey approval of [potentially] illegal government conduct." <u>See</u> <u>Lujan</u>, 510 F.2d at 66.

The Government appears to have deliberately omitted information from documents provided to an ally nation; backdated documents to create the impression that a United States request for deportation existed at a time when it did not; and then effectuated the removal of a United States citizen from a foreign nation under conditions akin to a kidnapping—with his eyes and ears covered and without providing an accurate explanation about where he was going and why.

While the Government claims Hiya's characterizations of the events leading to his arrival in the United States as a "scheme to kidnap" him are inaccurate and misleading, they make no attempt to present an alternate characterization or a different series of events. This Court understands the Government was under no obligation to rebut Hiya's characterizations or recollection of the events, but given the troubling accusations, a rebuttal may have been warranted.[5]

The events of this case are further suspect because of the nature of the charge for which Hiya was ostensibly brought to the United States—a passport fraud charge

---

[5] It is worth highlighting that because an extraditee is not entitled to discovery, it will typically be difficult, if not impossible, to demonstrate to a court the type of concerning behavior alleged here. The very fact that Hiya, despite those limitations was able to convincingly support his allegations speaks volumes.

in connection with the passport applications of Hiya's two minor children.  While the Government, of course, has an interest in and a right to pursue all alleged criminal acts regardless of the range of potential punishment, this Court is extremely skeptical that the Government would have taken the steps seen in this case solely for a passport fraud.  While pretext is allowed as long as there is probable cause for the United States based charge, pretext in the context of an international arrest is still troubling.

The United States' commitment to due process not only covers the way in which our citizens are tried, but the methods and manner used to procure their presence in the United States as well.  See Toscanino, 500 F.2d at 275.  The bedrock principles of due process are that our government must act in a way that is just and fair.  Because the line in Toscanino was drawn so high, we are left with a set of facts in this case reeking of wrongness and unfairness but dwarfed by Toscanino, and therefore short of the threshold that would allow for recourse.    Given the extraordinary facts of Toscanino, it may be time to create a new spectrum of what conduct "shocks the conscious."  This Court, however, is bound by precedent.

## B. Probable Cause for the Charged Crimes

The evidence of probable cause included in Israel's request for Hiya extradition largely relies on the affidavit of "Pnina Levy, Senior Deputy A in the Tel Aviv District [Criminal] Attorney's Office" (the "Levy Affidavit").  Dkt. No. 13-1 at 142–56.  The Levy Affidavit describes: the testimony of informant A.A. about the alleged plan to murder Musli; seized evidence including cell phones and get away vehicles;

surveillance footage; wiretaps; opinions of explosive experts; and statements by Levy that Hiya and his deputy equipped individuals with a multitude of weapons.  Id.

Hiya makes three arguments to contest probable cause for the crimes for which Israel seeks his extradition.  First, he argues that the extradition request by Israel (the "Request") is unsupported by the affidavit that provides the factual basis for the Request.  Hiya Memo at 26.  More specifically, Hiya claims that the Request states Hiya was personally present in Tel Aviv on December 31, 2023 and January 7, 2024 in connection with the murder plan, but the affidavit only states that his voice was heard on a recording coming from a vehicle located in Tel Aviv on December 31, 2023. Id.  Hiya also attempts to introduce contradicting evidence that he was not in Tel Aviv during those dates.  Id. at 27.

Second, Hiya claims that the testimony of informant A.A. is unreliable because "A.A. will be compensated—both financially and through leniency—for implicating" Hiya.  Hiya Memo at. 27–28.  Hiya claims that A.A. will be paid $105,442 by the Israeli government and have his sentence capped at five years.  Id. at 28.

Lastly, Hiya argues that the Levy Affidavit does not "provide independent corroboration for the allegations that Mr. Hiya directed the alleged plot."  Hiya Memo at 28–29.  Hiya supports this position by arguing the Levy Affidavit relies on A.A. to connect Hiya to the phone calls and text messages instead of providing independent proof that the caller or texter was Hiya.  Id. at 29.  Hiya also supports his position by arguing the Levy Affidavit's testimony regarding surveillance video of A.A., speaking to Hiya on a video call, outside the hotel where Musli was staying does not include

27

when the footage was taken or what the substance of the conversation included.  Id.
Hiya also makes this same argument regarding a still image of a different call
between Hiya and A.A.  Id.  Hiya then argues the Levy Affidavit fails to establish a
link between himself and the plot to murder Musli, but instead makes conclusory
statements that Hiya initiated, planned, and financed the plot.  Id. at 30.  Finally,
Hiya argues that witness B.B., mentioned in the Levy Affidavit, claims to confirm the
details of the plot to murder Musli but B.B.'s affidavit conceded he does not know
Hiya "in person."  Id.

The Government's arguments are straight forward.  The Government contends
there is sufficient evidence for probable cause found in the Request.  Gov. Memo at
16–18; Gov. Reply at 17.  The Government also argues that Hiya's attempts to
introduce contradictory evidence is impermissible.  Gov. Reply at 17–18.  Including
impermissible attacks on A.A.'s credibility.  Id.  (citing Matter of Locatelli, 468 F.
Supp. 568, 573-74 (S.D.N.Y. 1979)).

"[T]he function of the extraditing magistrate is not to decide guilt or innocence
but merely to determine whether there is competent legal evidence which . . . would
justify his apprehension and commitment for trial if the crime had been committed
in that state."  Shapiro v. Ferrandina, 478 F.2d 894, 900–01 (2d Cir. 1973) (internal
quotations and citations omitted).  "Thus, evidence of alibi or of facts contradicting
the demanding country's proof or of a defense such as insanity may properly be
excluded from the Magistrate's hearing."  Id. (citations omitted).  Here, Hiya attempts
to use evidence that would establish an alibi that he was not in Tel Aviv, although

28

such evidence still would not "obliterate" probable cause.  Hiya Memo at 27.  As this Court previously warned Hiya, such contradictory evidence can not be relied upon to rebut probable cause.  Dkt. No. 30 at 35–36.

Similarly, Hiya attempts to introduce evidence that attacks the credibility of informant A.A.    Hiya Memo at. 27–28.    Evidence attacking credibility is impermissible in extraditions and the Court cannot rely on it.  In re Pena-Bencosme, 341 F. App'x 681, 683 (2d Cir. 2009) ("the existence of evidence contradicting or calling into question the requesting state's primary evidence ordinarily has no import as it does not vitiate or obliterate probable cause, but rather merely 'pose[s] a conflict of credibility' that generally 'should properly await trial in [the requesting country].'") (citing Shapiro, 478 F.2d at 905)); see also Matter of Extradition of Vukcevic, No. 95CRIM.MISC.1P.1 (MHD), 1995 WL 675493, at *7 (S.D.N.Y. Nov. 14, 1995) ("First, as a general matter, the defendant cannot challenge the credibility of government witnesses or evidence in an extradition hearing.")

Hiya also attempts to rebut probable cause by isolating each piece, and sometimes individual line, of evidence presented against him.  Those arguments are flawed as this Court's job is to decide probable cause based on the totality of the circumstances.  See Matter of Extradition of Hyuk Kee Yoo, 2021 WL 2784836, at *7 ("To determine whether there is probable cause, courts use a "flexible, common sense standard" taking into account the "totality of the circumstances.") (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

While Hiya's potential alibi and impeachment material may carry the day at a future trial, they are wholly inadmissible and irrelevant to this Court's probable cause analysis.  The Request and accompanying Affidavit are sufficient to establish probable cause for the crimes for which Israel seeks Hiya's extradition.

### C. Hiya's Request for Discovery

Hiya requests that in the event this Court decides it does not have enough information to decide any of the grounds for his arguments, this Court "should order the government to provide discovery and order an evidentiary hearing."  Hiya Memo at 32.

This Court does not need additional information and can decide the issue based on the evidence before it.  Additionally, an extraditee's right to introduce discovery in an extradition proceeding is limited to discovery that would explain rather than contradict the requesting country.  Messina, 728 F.2d at 80.  This Court has already held that Hiya is not entitled to contradictory evidence to rebut the sufficient showing of probable cause and it will not permit discovery requests to support more attempts to do so.  See supra Section (III)(B) at 30–31; see also Jhirad v. Ferrandina, 536 F.2d 478, 484 (2d Cir. 1976) ("extradition proceedings are not to be converted into a dress rehearsal trial.")  Moreover, some of Hiya's discovery requests seemingly seek to uncover information about his arrest and the motivation behind it.  Hiya Memo at 31–32.  Given this Court's conclusion—that accepting all Hiya's allegations as true it still would not amount to a due process violation—any discovery related to those

arguments is futile.  See supra Section (III)(A)(ii) at 17–24.  Thus, Hiya's request for additional discovery and another hearing is DENIED.

## IV.    CONCLUSION

For the foregoing reasons, this Court finds that it has jurisdiction over Hiya, the evidence submitted is sufficient to establish probable cause for the crimes for which Israel seeks Hiya's extradition, and the remaining uncontested prerequisites for certification of an extradition have been satisfied.

The United States Attorney's Office for the Southern District of New York is directed to forward a copy of this Certification and Order, together with a copy of the transcript of the December 9, 2024 hearing and the exhibits received in evidence, to the Secretary of State.

Several documents in this matter have been filed with redactions.  The Party, if any, seeking to keep those documents redacted shall file a letter motion citing to the applicable standards for sealing **by June 30, 2025**.  A response, if any, shall be due **July 7, 2025**.

SO ORDERED.

DATED:    New York, New York
              June 23, 2025

_Jennifer E. Willis_
JENNIFER E. WILLIS
United States Magistrate Judge